UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| T.V., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:09-CV-290 PPS-RBC |
| | ) | |
| SMITH-GREEN COMMUNITY | ) | |
| SCHOOL CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment**

**Introduction**

The Smith-Green Community School Corporation's policy governing extracurricular, co-curricular, and athletic participants allows the high school principal to punish students who engage in out-of-school conduct that, in his subjective estimation, reflects discredit on the school, even if the conduct was not disruptive to the school in any way. This includes conduct which is protected by the First Amendment. The policy is unconstitutional and void. The plaintiffs in this case were improperly and unconstitutionally punished under this policy and they are entitled, based on the uncontested facts, to a determination that their past punishment was unconstitutional and that defendants are liable for their damages. *See Logan v. Commercial Union Insurance Co.,* 96 F.3d 971, 978 (7th Cir. 1996) (setting out the summary judgment standard).They are also entitled to an injunction preventing enforcement of the policy. The matter should then be set for trial on the amount of damages.

**Statement of material facts**

The High School and the policy

Smith-Green Community School Corporation ("SGCS") is located in Churubusco,

Indiana, and provides public education for children in portions of Whitley and Noble Counties. (Defendants' Answer to Plaintiffs' Amended Class Action Complaint for Declaratory and Injunctive Relief and Individual Action for Damages [Doc. No. 48] ["Answer"] ¶ 8).  The public high school operated by SGCS is Churubusco High School.  (*Id.*).  Defendant Austin Couch is principal of the High School.  (Answer ¶ 9).

There are approximately 400 students at the High School.  (Affidavit of Plaintiff T.V., Attached as Exhibit 1 to Plaintiffs' Reply Memorandum in Support of Motion for Class Certification  [Doc. No. 30] ["T.V. Aff."] ¶ 2; Affidavit of Plaintiff M.K., Attached as Exhibit 2 to Plaintiffs' Reply Memorandum in Support of Motion for Class Certification  [Doc. No. 30] ["M.K. Aff."] ¶ 2).  At least 200 students are engaged in co-curricular activities, athletics, or other extra-curricular activities.  (T.V. Aff. ¶ 3; M.K. Aff. ¶ 3).  Co-curricular activities are those that provide academic credit, but which involve activities that take place outside of the normal school day, such as the show choir.  (Deposition of Superintendent Steve Darnell ["Darnell"] at 24, Exhibit 1 to Plaintiffs' Motion for Summary Judgment).

The 2008/2009 Student Handbook provided regulations for students engaged in extra-curricular and co-curricular activities and athletics.  (Churubusco High School 2008/2009 Student Handbook ["2008/2009 Handbook] at 25, Exhibit B to deposition of Austin Couch ["Couch"], which deposition is Exhibit 2 to Plaintiffs' Motion for Summary Judgment).  It provided, under the heading "Extra-Curricular/Co-Curricular Activities" that "[i]f you act in a manner in school or out of school that brings discredit or dishonor upon yourself or your school, you may be removed from extra-curricular activities for all or part of the year." (*Id.* at 24).  It further provided, under the heading "Extra-curricular/Co-Curricular Code of Conduct and Athletic Code of Conduct":

> The purpose of the "Extra-Curricular Code of Conduct" is to demonstrate to students at Churubusco High School who participate in organized extra-curricular activities that they not only represent themselves, but also represent Churubusco High School, as well. Therefore, those students who choose to participate in extra-curricular activities are expected to demonstrate good conduct at school and outside of school.  There are certain areas of conduct that are governed by the individual organization that the student represents.  These rules and regulations will vary depending upon the activity.  The "Extra-Curricular Code of Conduct: will standardize the behavior expectations for all students in the area of alcohol, tobacco, drugs, and academics.  This code shall apply to all students involved in extra-curricular or athletic programs at Churubusco High School  This code will be in force for the entire year including out of season and during the summer.

(*Id.*).  Additionally, the policy, under a heading of "Acts of Delinquency," provided that "A student involved in extra-curricular activities shall not commit a delinquent act.  A delinquent act includes, but is not limited to, theft, vandalism, harassment, or any other conduct that is not in accord with acceptable behavior under the law." (*Id.*).  Those students who commit a delinquent act will be removed from all extra-curricular activities for a period of one year.  (*Id.*).  However, if this was the student's first offense the student could seek evaluation from a licensed counselor and participate in a therapist-approved program and then appear before a review committee. (*Id.*).  If the review committee approves, the student's penalty could be reduced to 25% of the regular season for athletics or one calendar month.  (*Id.*).  The review committee consists of the principal or his/her designee, athletic director, and sponsors and/or coaches of the student charged with the violation.  (*Id.*).

In the 2009/2010 Student Handbook the extra-curricular/co-curricular policy was modified containing the identical language that a student may be removed for up to one year from activities if he or she acts in a manner, either in or out of school, that brings discredit or dishonor on the student or school.  (2009/2010 Student Handbook at 22).  It further provides, under the heading of "Extra-Curricular / Co-Curricular Code of Conduct and Athletic Code of Conduct," that it applies to all extra-curricular and co-curricular participants and states:

3

> It shall be recognized that the Principal, by the administrative authority vested in him/her by the Smith-Green Community School Corporation, may exclude any student-athlete from representing Churubusco High School if his/her conduct in or out of school reflects discredit upon Churubusco High School or the IHSAA[1] or creates a disruptive influence on the discipline, good order, moral, or educational environment at Churubusco High School.

(*Id.* at 23).  The 2010/2011 Student Handbook contains identical language. (Churubusco JR/SR High School – Student Handbook 2010-2011 at 20, 21 ["2010/2011 Student Handbook"], attached to Supplemental Affidavit of T.V. ["T.V. Supp."] Exhibit 3 to Plaintiffs' Motion for Summary Judgment ["2010/2011 Student Handbook"]). [2]

The 2009/2010 Handbook stated that the following was a violation of the Code of Conduct:  unauthorized possession, use, or transportation of drugs or alcohol, being in attendance where illegal drugs or alcohol is occurring, possessing alcohol or committing a crime. (2009/2010 Student Handbook at 23).   The current Student Handbook adds as a violation engaging in "inappropriate behavior that dishonor discredit (*sic*) the school or community."

---

[1]     Although not specified in the Handbook, it is believed that "IHSAA" stands for the Indiana High School Athletic Association.

[2]     The current handbook, like the 2009-2010 one, provides a "Policy Statement" following the above statements that provides:

> It should be recognized by both athlete and Smith-Green Community School Corporation that the enjoyment and participation in sporting events is a privilege.  Furthermore, since the athlete and athletics are often the most visible aspect of any school, it is imperative that the athletic representatives assume exemplary moral and physical standards.

> This code is designed to apply an even-handed brand of justice with some degree of flexibility.  Clearly, the major implementation of moral and physical standards must be relegated to the parents of the respective athlete; however, in an athletic and school atmosphere, Smith-Green Community School Corporation feels justified in stating certain minimum requirements to govern the behavior of the Churubusco High School Student/Athlete.

> A student/athlete is subject to this code from their first enrollment at Churubusco Jr./Sr. High School to completion of his/her last sport season at Churubusco Jr./Sr/ High School.  If he/she does not participate during a school year(s) or is under athletic suspension, he/she is considered to be an athlete and any violations during non-participation or athletic suspension may be brought before the Extra-Curricular Council.

(2010/2011 Student Handbook at 21, *cf.* 2009/2010 Student Handbook at 23 [referring to "Athletic Council."])

(2010/2011 Student Handbook at 21).   Additionally, the current Student Handbook has a paragraph following the list of violations that provides:

> [S]tudents (who participate in extra-curricular activities) who engage in behavior that is made public through written or photographic means, blogs, emails, web pages, etc. and is contrary to the accepted rules and values of the SGCS Corporation, may be subject to discipline.  Behaviors that are contrary to the acceptable rules and values of SCGS include, but are not limited to the following: defamatory or threatening language; nudity or partial nudity; material of a sexual nature or sexual innuendo; promotion of alcohol, drugs, tobacco or other substances; promotion of gangs, weapons, or violence; and other lewd or socially unacceptable behavior.

(2010/2011 Student Handbook at 21-22).

Under the rules set out in both the 2009/2010 and 2010/2011 handbooks, a person violating the policy will be removed from all extra-curricular activities for a year.  (2009/2010 Student Handbook at 24; 2010/2011 Student Handbook at 22). However, the identical opportunity for a reduction of the penalty to 25% or one month as was provided in the 2008/2009 handbook is also provided in the 2009/2010 and 2010/2011 handbooks.  (*Id.*).  In the 2009/2010 handbook the body given the authority to reduce the year-long penalty is the "Athletic Counsel" that consists of the Athletic Director, Principal or Designee and all head coaches. (2009/2010 Student Handbook at 24).  In the 2010/2011 handbook the appeal body is the "Extra-Curricular Council" and, in addition to the above persons, also includes any additional sponsors, coaches or administrators necessary for the discipline.  (2010/2011 Student Handbook at 23).[3]

Both the 2009/2010 and the 2010/2011 handbooks provide a warning that sending, sharing, viewing and/or possessing pictures, text messages, e-mails or other images of a sexual

---

[3]       Decisions from the Athletic Council (in the 2009/2010 handbook) or Extra-Curricular Council (in the 2010/2011 handbook), may be appealed to the Superintendent who will notify the school corporation's hearing officer who will preside over an appeal.  (2009/2010 Student Handbook at 24; 2010/2011 Student Handbook at 22). The hearing examiner will make his or her findings known to the Superintendent who will then issue a final decision. (*Id.*).

nature in electronic or other format is prohibited. (2009/2010 Student Handbook at 37; 2010/2011 Student Handbook at 34). The handbooks further specify that school personnel have a legal duty under Indiana law to report to law enforcement any student who is involved with child exploitation of child pornography under Indiana law. (*Id.*).

The extra-curricular, co-curricular, and athletic code of conduct policy are the official policies of SGCS. (Darnell at 14-15, Defendants' Answer ¶ 17). As indicated, the 2008/2009, 2009/2010, and 2010/2011 handbooks all allow for removal from activities if students bring "discredit" upon themselves or their school and the 2008/2009 and 2010/2011 handbooks allow removal if there is a "disruptive influence" or create disruption. These terms are not defined and it is up to the principal to determine if there is "discredit". (Darnell at 24-25). Mr. Couch defines the notion of bringing discredit on the school as:

> Sense of pride. Sense of pride in school. That we want to be – we want to promote good citizenship, and we want a good moral standard with the students to be, you know, this is what's right and wrong, and – at times, when we put ourselves in a bad situation, or shed ourselves in a bad light, that other people from the community will see that and will ultimately reflect that upon the student body at our school.

(Couch at 73-74).

It is also the duty of the principal to determine if there has been a disruption to the educational environment at the school. (Darnell at 24-25). Mr. Couch defines disruption:

> When a student comes to school, they have the right, I believe, to feel safe when they come to school and not feel that the information that gets out there is going to be brought up, it's going to be discussed or argued in the hallways, in the gymnasiums or the classrooms. In a small school, it has been my experience that – at any school, it has been my experience that once this information gets to the hallways and the classrooms and the students, that it is discussed nonstop until it is dealt with, and it becomes a disruption because the educational process is disrupted by the comments or the continued activity.

(Couch at 76). According to the principal, something that takes place entirely out of school can

be disruptive if the students are talking about it at school and the athletic and extra-curricular code will be violated if the principle believes that "the educational process has been interrupted." (Couch at 76-77).

The plaintiffs and the photographs

In the summer of 2009, the plaintiffs T.V. and M.K. were entering the 10th grade at Churubusco High School.  (Deposition of T.V. ["T.V. Dep."] [attached as Exhibit 4 to Plaintiffs' Motion for Summary Judgment] at 13, 35-36; Deposition of M.K. ["M.K. Dep.] [attached as Exhibit 5] at 11, 18).  Both T.V. and M.K. play volleyball at the high school.  (T.V. Dep. at 15, 22, 24-26; M.K. Dep. at 9-10).  M.K. is also part of the New Era show choir and cheerleading. (M.K. Dep. at 9-10).

During parts of the summer of 2008, before practices started, the volleyball participants could attend "open gym" where teammates could engage in drills. (T.V. Dep. at 16).  There are try-outs in July and the freshman, junior-varsity, and varsity teams are selected and formal practices begin.  (*Id.* at 17-19).  From Monday, June 29, 2009 until Friday, July 3, 2009, there was a moratorium week between the open-gym and formal practices when no sporting activities took place.  (T.V. Dep. at 36; M.K. Dep. at 18; First Stipulation of the Parties [Doc. No. 64]**.**

During the moratorium week T.V., M.K., and a number of their girl friends had sleepovers at M.K.'s house.  (T.V. Dep. at 41-42; M.K. Dep. at 17-18).  Prior to the first sleepover the girls purchased at a store at the mall rainbow colored lollipops shaped like phalluses.  (T.V. Dep. at 45).  M.K. obtained a similar lollipop from her sister. (*Id.*).  T.V. has always liked photography and expresses herself through her photographs.  (*Id.* at 48, 106). Therefore,  during the first sleepover she and M.K. were taking photographs and the girls thought it would be funny to take pictures with the lollipops. (*Id.* at 48).  The girls therefore took a

number of pictures that involved them sucking on the lollipops. (T.V. Dep. at 44, Exs. D, H, M.N. Q, R to T.V. Dep.[4]) In one (Ex. Q), three girls are pictured and M.K. added the caption "Wanna suck on my cock." (*Id.* at 57). In another (Ex. N) a fully-clothed M.K. is sucking on a lollipop and another one is positioned between her legs and a fully-clothed T.V. is pretending to suck on it. (*Id.*). This picture was not intended to simulate oral sex, because the lollipop was obviously a toy and no one would mistake the multi-colored penis-shaped lollipop for a real penis. (*Id.* at 106-107).[5]

During another sleepover, T.V. took a picture of M.K. and another girl pretending to kiss each other. (Ex. E to T.V. Dep.). At a final slumber party a number of other pictures were taken while the girls were all in their pajamas, although M.K. was wearing lingerie (T.V. Dep. at 63, 67, Ex. P, O, K, J, G, and F to T.V. dep.). In Exhibit J, M.K. is talking on the phone and T.V. is holding a toy trident pointing at her. In Exhibit O she is bent over and M.K. is poking her on her buttocks with the trident. Although this picture shows T.V. "getting her up the butt," T.V. notes that no one would mistake the trident for a penis or anything sexual. (T.V. Dep. at 64, 107-08). In another picture M.K. is posing with money stuck into her clothing as if she was an exotic dancer. (T.V. Dep. at 63, Ex. K to T.V. Dep.).

When M.K. was in 8th grade she took a picture of herself and a friend pretending to smoke cigarettes, although the two were using fake cigarettes. (M.K. Dep. at 31-33, Ex. S to M.K. Dep.). Additionally, at some time prior to the start of her sophomore year of high school, M.K. took a picture of her and a friend, both clothed, with the friend putting her finger through

---

[4]     The photographs have been sealed pursuant to this Court's Order of December 17, 2009. (Doc. No. 22). They will be generally described in the memorandum, with the understanding that they are before the Court for viewing.

[5]     During the deposition T.V. agreed with defendants' counsel that this was a "simulation of oral sex." (T.V. Dep. at 58). However, T.V., again under questioning from defendants' counsel, indicated that she did not know what the work "simulate" means. (*Id.* at 114).

her pants and M.K. on the ground pretending to put the finger in her mouth.  (*Id.* at 33-36, Ex. I to M.K. Dep.).[6]  Both of the girls are laughing because "it's so unrealistic."  (*Id.* at 34).

At no point were the girls smoking, drinking, or taking drugs.  (T.V. dep. at 67).  They thought the photographs were funny and they were just playing around. (T.V. dep. at 55, 78; M.K. dep. at 43).

T.V. believes that she posted all the pictures, except for Exhibits I, O, Q and S on her MySpace and/or Facebook accounts where they were accessible to persons granted "friend" status. (T.V. Dep. at 69-76).  This means that people can access them only if they were on her friend list. (M.K. Dep. at 24).  M.K. posted Exhibits E, I, L, and S and the photos with the lollipops.  (*Id.* at 31-43).[7]  Some, depicting the lollipops, were posted on Photo Bucket where a password is necessary for viewing.  (*Id.* at 27, 37-38).  Others were on Facebook where they were viewable only by  her "friends."  (*Id.*).

None of the pictures identify the girls as being from Churubusco High School. (Exhibits D-S T.V. Dep.; Couch Dep. at 48). The pictures were only posted on the above electronic accounts and were never brought to school either in digital or any other format by T.V. or M.K. (Couch Dep. at 49; T.V. Supp. ¶ 2, Supplemental Affidavit of Plaintiff M.K. ¶ 2, Exhibit 6 to Plaintiffs' Motion for Summary Judgment ["M.K. Supp."]). The pictures were not delinquent acts. (Couch at 82).

<u>The punishment of the plaintiffs</u>

On, or about August 4, 2009, during summer vacation[8], a parent brought the pictures

---

[6]     The friend in the picture is not T.V.  (*Id.* at 33).

[7]     M.K. does not believe she posted Exs. F, G, K, J or P on any of her sites. (M.K. dep. at 36-40)

[8]     School started August 21, 2009.  (Couch Dep. at 43).

(Exs. D-S to T.V. Dep.) to Steve Darnell, the Superintendent of Smith-Green Community School Corporation and reported that they were posted on Facebook and Photobucket and were causing divisiveness on the volleyball team, although the person was not a parent of a volleyball player. (Darnell at 10-11, T.V. Supp. ¶¶ 4-5; M.K. Supp. ¶¶ 3-4).  The Superintendent did no fact-finding, but immediately went to Principal Couch and gave him the pictures and instructed him to "follow code with this."  (*Id.* at 11-12).

Given that registration for the 2009-2010 school year had not started, any discipline that would be imposed was pursuant to the 2008-2009 student handbook.  (*Id.* at 15).[9]  Principal Couch was charged with determining if there was a violation of the policy. (Darnell at 14; Couch Dep. at 35).  The Principal discussed this with the athletic secretary, who had provided him with separate information about the photographs and who helped him to identify and label the girls in the photographs, although when Mr. Couch received the photographs someone had already put names on them.  (Couch Dep. at 25-28, 32-34).  Mr. Couch also spoke with the Athletic Director and the Assistant Principal.  (*Id.* at 31, 35).  Aside from the Superintendent and perhaps the school's attorney, these are the only persons he spoke to and the only persons who saw the photographs. (*Id.* at 31-36).

At this time, prior to the school year beginning, T.V. and M.K. were both participating in summer practices for volleyball and M.K. was in summer practices for show choir.  (*Id.* at 37-38).  The only conversation that Mr. Couch had with the volleyball coach was immediately before the girls were summoned to the Principal's office to ask if the girls were playing volleyball and to inform him that he needed to speak to them because of an extracurricular violation.  (*Id.* at 39-40).  There were no other conversations with anyone from the volleyball coaching staff.  (*Id.* at 40).  The Principal did not speak with the show choir director until after

---

[9]    The first registration dates was August 6, 2009.  (Couch Dep. at 41-42).  The school year did not start until

M.K. was suspended, and the sole purpose of the conversation was to inform him of the suspension.  (*Id.* at 41).

In investigating the matter, Principal Couch did not conclude that the pictures had caused any disruption at the school.  (*Id.* at 43).  Instead, he was concerned that the photographs had the potential of causing disruption. (*Id.*).  He based this on the fact that in the spring of 2009 another incident, involving internet photos of students engaging in consumption of alcohol, occurred that resulted in students talking about it in the hallways and gymnasiums, which he characterized as a disruption. (*Id.* at 44-46).  In this earlier incident the photos were brought to school.  (*Id.* at 45). The principal was also concerned that this was two weeks after two students had died in a car accident and he wanted to get the new school year off on "the right foot."  (*Id.* at 44).

After investigating the matter for a day, Mr. Couch informed the girls that they were being suspended for a calendar year pursuant to the extra-curricular policy for bringing discredit on themselves and the school.  (*Id.* at 11, 49-52, 73; Ex. T and U to Couch Dep.; Affidavit of Austin Couch ¶7 [Doc. No. 18-2]).  The girls were told that they could seek treatment and reduce their punishment by appearing before the Athletic Board. (Couch Dep. at 53).  Both of the girls were extremely upset about their suspensions and contacted their parents. (T.V. Dep. at 79-80; M.K. Dep. at 48).  The parents spoke to Mr. Couch who informed them that under the athletic code he had the right to make this decision and that the photographs brought disrespect on the school or the girls.  (Couch Dep. at 56).  T.V.'s parents also spoke to the Superintendent who stated that Mr. Couch had made his final decision and that he was backing the Principal. (Darnell Dep. at 18, 20).

Both girls opted to visit a counselor for the mandatory three visits, and completed them by August 13, 2009.  (T.V. Dep. at 91; M.K. Dep. at 57; Couch Dep. at 59).  The counseling

embarrassed T.V., because it made her feel like a sex addict, although the counselor thought it was not fair that the girls had gotten into trouble for their actions. (T.V. Dep. at 93. 95). M.K. notes that she did not need "sexual counseling." (M.K. Dep. at 61). The counseling reports were given to Principal Couch.  (Defendants' Answer ¶ 33).

Following the counseling the girls appeared before the Athletic Board consisting of the Principal, the Athletic Director, the Assistant Principal, and coaches.  (Couch Dep. at 62-63; Interrogatory No. 6, Ex. V. to Couch Dep.).  All of the Board members were male.  (Couch Dep. at 65).  Principal Couch instructed the girls that they would have to apologize for what they did. (*Id.* at 83-84). The two girls appeared separately for 5-10 minutes. (*Id.* at 67).  Both of the girls did not like appearing before this all-male group and discussing what they had done.  (T.V. Dep. at 86-87; M.K. Dep. at 56-57).

Following their appearance before the Athletic Board the punishment was modified and the girls missed 25% of their fall extra-curricular activities. (Defendants' Answer ¶ 36).  This translated to T.V. missing six games and M.K. missing five games and a show choir performance. (T.V. Dep. at 89, M.K. Dep. at 55).  The girls did not miss any school.  (*Id.*).  Prior to this time the girls had no prior school discipline issues. (Couch Dep. at 84).

The current effects on the plaintiffs

Both of the plaintiffs have noted that they continue in extra-curricular activities  at the High School and because of their prior punishment they are reluctant to express themselves as freely on social networking pages and are more reluctant to share pictures and other information with their friends and communicate with their friends.  (T.V. Aff. ¶¶ 8- 9; M.K. Aff. ¶¶ 8-9; T.V. Supp. ¶ 6, M.K. Supp. ¶ 5: M.K. Dep. at 10, 59; T.V. Dep. at 109-110).   If they are again suspended for violating the code of conduct they will be denied the right to participate in any

extra-curricular, athletic, or co-curricular activities for a year, with no ability to reduce the penalty. (2010/2011 Student Handbook at 22).

**Argument**

### I.   The photographs that caused the plaintiffs' discipline are protected by the First Amendment

The plaintiffs posted the photographs because they thought they were humorous and wanted their friends to be able to see them. "[A]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Bolger v. Youngs Drug Products Corp*., 463 U.S. 60, 65 (1983) (quoting *Police Department v. Mosley*, 408 U.S. 92, 95 (1972). This includes restrictions on photographs, *Beard v. Banks*, 548 U.S. 521, 543 (2006)[10], matters that are humorous, *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 969 (10th Cir. 1996)[11], as well as matters on the internet, *Clement v. California Dept. of Correction*, 364 F.3d 1148, 1151 (9th Cir. 2004)[12].

However, there is expressive material that falls outside of the protections of the First Amendment, including child pornography as adequately defined by applicable law. *New York v. Ferber*, 458 U.S. 747, 764 (1982). Although the defendants have at various points in this litigation alluded to their belief that the pictures are pornographic, this is clearly erroneous.

Indiana law defines child pornography in terms of the depiction of sexual conduct, which:

> means sexual intercourse, deviate sexual conduct, exhibition of the uncovered genitals intended to satisfy or arouse the sexual desires of any person, sadomasochistic abuse, sexual intercourse or deviate sexual conduct with an animal, or any fondling or touching of a child by another person or of another

---

[10]   "It is indisputable that this prohibition on the possession of newspapers and photographs infringes upon respondent's First Amendment rights . . . See also *Kaplan v. California*, 413 U.S. 115, 119-120 . . . (1973) (explaining that photographs, like printed materials, are protected by the First Amendment.)"

[11]   "The cards are no less protected because they provide humorous rather than serious commentary. Speech that entertains, like speech that informs, is protected by the First Amendment."

[12]   "It [the First Amendment] protects material disseminated over the internet."

> person by a child intended to arouse or satisfy the sexual desires of either the child or the other person.

IND. CODE 35-42-4-4(a).  The pictures in this case do not involve nudity, intercourse or sexual conduct, and they certainly are not intended to satisfy or arouse sexual desires. They therefore fall far short of the Indiana definition of child pornography.

The same conclusion must be reached when the federal definition of child pornography is viewed.  *See* 18 U.S.C. § 2251.  This statute prohibits using minors to engage in "any sexually explicit conduct for the purpose of producing any visual depiction of such conduct."  18 U.S.C. § 2251(a).  "Sexually explicit conduct" is defined as: graphic or lascivious simulated bestiality, masturbation, sadistic or masochistic abuse; graphic or simulated lascivious exhibition of the genitals or pubic area; or, graphic sexual intercourse or lascivious simulated intercourse where genitals, breast or pubic area of any person is exposed.  18 U.S.C. § 2256(2)(B). Simulated sexual intercourse must be "explicitly portrayed, even though (through camera tricks or otherwise) it may not actually have occurred" so that a reasonable person believes it did occur. *United States v. Williams*, 553 U.S. 285, 297 (2008).  Again, the pictures here fall far short of the federal definition of "sexually explicit conduct."  They are sophomoric, not pornographic, and are therefore entitled to protection under the First Amendment.

**II.     The punishment of the plaintiffs violated the First Amendment**

To conclude that the photographs are entitled to protection under the First Amendment does not answer the question as to whether the plaintiffs' punishment violated the First Amendment.  Their suspension from extra-curricular activities violated the First Amendment for two reasons. Defendants' punishment violated the limitations on the ability of the school to discipline students established by *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), and its progeny, and the policy, which allowed the plaintiffs to be punished for non-

school disruptive out-of-school expressive conduct is unconstitutionally vague and overbroad.

**A.    The punishment of the plaintiffs for their out-of-school, non-disruptive, expressive conduct, violated the First Amendment**

In *Tinker* the Supreme Court famously noted that students do not shed their First Amendment rights. *Id.* at 506.  Instead, while in school a student is free to express herself "if he does so without 'materially and substantially interfere[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others."  *Id.* at 513 (internal citation omitted).  The Court cautioned that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 509.

Subsequent Supreme Court precedent has focused on student discipline in the context of in-school or at school-approved activities.  Thus, in *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), the Court allowed the school to sanction a student who, at a high school assembly gave a lewd and vulgar speech.  "It was perfectly appropriate for the school to disassociate itself" from the speech taking place on its premises.  *Id.* at 686.  In *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), the Court held it was constitutional for the school to edit a student story in the school's newspaper given that the paper was part of regular school activity and not a public forum, thus allowing the school to impose reasonable restrictions on its contents. *Id.* at 571.  And, in *Morse v. Frederick*, 551 U.S. 393 (2007), the Court allowed a student to be disciplined who violated school rules by hanging a banner construed as promoting drug use at a school-sanctioned and school-supervised event given that schools are not required to "tolerate at school events student expression" that endorses illegal drug use. *Id.* at 410.

The Supreme Court, therefore, has not addressed the question of when expressive conduct taking place off of school grounds at non-school activities, can constitutionally lead to punishment in school. However, the lower courts, using the *Tinker* standard of "material and

substantial interference" as a guide, have frequently addressed this question.  In a host of cases, courts have held that expressive activity that is not a threat and takes place entirely off of school grounds cannot be used to discipline a student unless the activity becomes substantially disruptive in the school.  *See, e.g., Boucher v. Sch. Bd. of the School Dist. of Greenfield,* 134 F.3d 821, 827 (7th Cir. 1998) (vacating an injunction that prohibited expulsion proceeding against a student who had published an off-campus article on how to "hack" into the school's computers given the demonstrated disruption caused by the article); *Thomas v. Board of Educ., Granville Central*, 607 F.2d 1043, 1052 n.17 (2nd Cir. 1979) (First Amendment prohibited suspension of students for publishing an alleged morally offensive, indecent, and obscene off-campus publication where there was no substantial disruption); *Shanley v. Northeast Indep. Sch. Dist.,* 462 F.2d 960, 970 (5th Cir. 1972) (off-campus newspaper was not disruptive); *J.C. v. Beverly Hills Unified Sch. Dist.*, −F.Supp.2d−, 2010 WL 1914215, *20-*23 (C.D. Cal. 2010) (suspending student because of video clip on website making derogatory, sexual, and defamatory statements about class mate was improper inasmuch as everything was done outside of school and there was no substantial disruption or reasonably foreseeable risk of such disruption); *Evans v. Bayer*, 684 F.Supp.2d 1365, 1374 (S.D. Fla. 2010) (suspension of student for creating an off-campus website to express dislike for a teacher was unconstitutional inasmuch as, among other things, there was no disruption in the school); *Mahaffey v. Aldrich*, 236 F.Supp.2d 779, 781-82, 786 (E.D Mich. 2002) (suspension of student who contributed material to a "Satan's web page", including a list of people he wanted to die violated the First Amendment, inasmuch as there was no proof of school disruption, even though school computers might have been used to create the site); *Killion v. Franklin Reg'l Sch. Dist.*, 136 F.Supp.2d 446, 448, 455 (W.D. Pa. 2001) (student's suspension for publishing, out of school, a derogatory and sexual "Top Ten List"

about the school's athletic director would violate the First Amendment because, among other things, it was not substantially disruptive); *Beussink v. Woodland R-IV Sch. Dist.*, 30 F.Supp.2d 1175, 1180 (E.D. Mo. 1998) (preliminary injunction granted to prevent discipline of student who had created a website home page off of school grounds that was extremely critical of his high school and used vulgar language concerning his teacher given that no material or substantial disruption of the school was demonstrated).

The First Amendment analysis is no different when the expressive activity causes punishment affecting extra-curricular activities, as opposed to school attendance. In *Flaherty v. Keystone Oaks School District*, 247 F.Supp.2d 698, 703-04 (W.D. Pa. 2003), the Court found that a school policy, applied to a student posting messages on a website, which resulted in the student being disciplined for bringing "discredit" to the school and volleyball team was unconstitutional because, *inter alia*, it was not limited to activity that was disruptive under *Tinker*. News reports concerning the case specify that the student's punishment consisted of being removed from the volleyball team, the coach of whom he criticized in the posting, as well as being denied the ability to attend non-school related functions at the school or use the school's computers.  Milan Simonich, Newsmaker: Jack Flaherty Jr. / Teen fought school district in court, won, Dec. 02, 2003, http://www.post-gazette.com/localnews/20021202newsmakerreg5p5.asp.

There are numerous other examples of the *Tinker* standards being applied to extra-curricular activities. Thus, in *Pinard v. Clatskanie School District 6J*, 467 F.3d 755 (9th Cir. 2006), the Court found that high school basketball team players had a First Amendment right to submit a petition requesting the coach's resignation and that suspension of the players would be unconstitutional unless facts were presented showing a risk of substantial disruption or material interference as required by *Tinker.  Id.* at 764.   In *Lowery v. Euverard*, 497 F.3d 584 (6th Cir.

2008), the court held that there was no First Amendment violation where players were removed from the high school football team after signing a petition critical of the coach.  The court reached this opinion by noting the applicability of *Tinker* and that substantial disruption to the team was obvious. *Id.* at 596.  But the court also noted that the First Amendment still bounded the school's disciplinary abilities, even with extra-curricular activities.  "Of course, players do not completely waive their rights when they join a team: a coach could not dismiss a player simply because the player had religious or political views that were unpopular with his teammates." *Id.* at 600.  This is clear from *Tinker* itself where the Court stressed that students possess First Amendment rights "[w]hen he is in the cafeteria or on the playing field." *Id.* at 512-13.[13]

The Seventh Circuit has noted that the substantial disruption standard and the relevant case law require "the school to present 'facts which might reasonably lead school officials to forecast substantial disruption.'" *Nuxoll v. Indian Prairie School Dist. # 204*, 523 F.3d 668, 673(7th Cir. 2008).  But in this case the principal conceded that the photographs, taken during summer vacation, had caused no disruption at the time the girls were punished prior to the start of the instructional year.  (Couch Dep. at 43).  And, his fear of the potential for disruption if he did not act was limited to concern that students would be discussing the photographs.  (*Id.* at 44). There was absolutely no hint of disruption of educational functioning and such a hint would be insufficient in any event given that a court "cannot accept, without more, that the childish and

---

[13]       There are numerous other examples where courts have recognized that the school's ability to deny extra-curricular activities to a student is not unlimited, and is controlled by the First Amendment. *See e.g.*, *Doninger v. Niehoff*, 527 F.3d 41, 50-51 (2nd Cir. 2008) (barring student from running for class office because of derogatory blog posting about the school was not a First Amendment violation inasmuch as the posting created a substantial risk of disruption); *Seamons v. Snow*, 206 F.3d 1021, 1028 (10th Cir. 2000) (if proven, dismissal of football player because he refused to apologize for reporting assault by other team members would violate the First Amendment);*Boyd v. Board of Directors of the McGehee School Dist. No. 17*, 612 F.Supp. 86, 92-93 (E.D. Ark. 1985) (suspension of students from football team for refusing to play in a game as a protest for racial discrimination in selecting the home-coming queen violated their First Amendment rights).

boorish antics of a minor could impair the administrators'' abilities to discipline students and maintain control." *Killion*, 136 F.Supp.2d at 456. Inasmuch as *Tinker* requires "material[] and substantial[] interfere[nce] with the requirements of appropriate discipline in the operation of the school," 393 U.S. at 509, it is clear that punishing the plaintiffs violated the First Amendment.[14]

### B.     Plaintiffs' First Amendment rights were violated because the standards used to discipline them were vague and substantially overbroad

The plaintiffs were suspended from extra-curricular activities because of SGCS' policy allowing such exclusions if the principal concluded that they had brought discredit or dishonor upon themselves and the school.  However, these standards are unconstitutionally vague and overbroad and the discipline imposed was therefore unconstitutional for this reason as well.

The vagueness doctrine under the First Amendment dictates that a regulation "offends the First Amendment when it grants a public official 'unbridled discretion' such that the official's decision to limit speech is not constrained by objective criteria, but may rest on ambiguous and subjective reasons.'" *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998) (quoting *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996)). The concern is that a vague proscription will lead those affected to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked . . . . Free speech may not be so inhibited." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (internal citation omitted).

In the First Amendment context, a frequent companion to the void for vagueness doctrine

---

[14]     Examples of out-of-school, but substantially disruptive, events include: an instant message threat sent via computer that the person would get a gun and kill specific classmates  where numerous parents refused to send children to school, security at the school had to be increased,  and media descended upon the school administration, interrupting educational duties of the staff, *Mardis v. Hannibal Pub. Sch. Dist., # 60*, 684 F.Supp.2d 1114, 1122-25 (E.D. Mo. 2010); and, out-of-school postings, using vulgar language, that misleadingly urged students to contact the school about a cancelled event that was not actually cancelled, resulting in threats of a student sit-in and substantial risk of general disruption of school operations, *Doninger v. Niehoff*, 527 F.3d at 50-52.  In the case at bar, there was no disruption, substantial or otherwise.

is the prohibition on overbroad legislation.

> Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face "because it also threatens others not before the court -- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503 . . . (1985). A statute may be invalidated on its face, however, only if the overbreadth is "substantial." *Houston v. Hill,* 482 U.S. 451, 458-459 . . . (1987).

*Bd. of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574 (1987). Substantial overbreadth is present if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801 (1984).

It is, of course, true that because schools "need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686. Nevertheless, case law is clear that a standard allowing punishment for something that "discredits" self or school is constitutionally impermissible.

In *Flaherty*, the court noted that the policy concerning "inappropriate" speech that had been interpreted as allowing for punishment for bringing discredit on the school or volleyball team was unconstitutionally vague and overbroad given that the terms were not defined or limited to speech occurring at school or school events that caused material and substantial disruption. 247 F.Supp.2d at 701, 706. Other courts have also recognized that school policies containing similarly uncertain prohibitions are similarly constitutionally deficient. *Smith v. Mount Pleasant Public Schools*, 285 F.Supp.2d 987, 996 (E.D. Mich. 2003) (policy allowing for student discipline for "verbal assault", defined as threatening a person's well-being and dignity,

was unconstitutionally vague and overbroad); *Coy v. Bd. of Educ. of North Canton City Schools*, 205 F.Supp.2d 791, 802  (N.D. Ohio 2002) (school rule allowing for discipline for any action judged to be inappropriate by school officials was unconstitutionally vague).  *See also See e.g.*, *Miller v. Penn Manor School Dist.*, 588 F.Supp.2d 606, 626-29(E.D. Pa. 2008) (student likely to succeed on claim that school policy was unconstitutionally overbroad and vague allowing for punishment for "anything that is a distraction to the educational environment.")

In *O'Brien v. Town of Caledonia*, 748 F.2d 403 (7th Cir. 1984), the court addressed disciplinary charges against a police officer that alleged he had caused serious "discredit" to the department and the town.  *Id*. at 408.  The court found that this was unconstitutionally vague "as it lacks objective criteria and can only be subjectively applied." *Id.* The term is no less unconstitutionally vague here. Moreover, the policy's application to out-of-school but non-disruptive conduct means that a student who attends a KKK or gay-rights rally and then blogs about it can be punished if his or her conduct is deemed to "bring discredit," even though it is not in any way disruptive.  Thus, the policy "could be interpreted to prohibit a substantial amount of protected speech."  *Flaherty*, 247 F.Supp.2d at 706.  Therefore application of the policy to plaintiffs was also a  First Amendment violation because the policy was  substantially overbroad and unconstitutionally vague.

**III.**.    **Both the school system and Principal Couch in his individual capacity are liable for plaintiffs' damages**

The punishment imposed on the plaintiffs therefore violated their First Amendment rights.  They were caused distress and embarrassment and are therefore entitled to their damages, the exact amount of which must be determined at trial. *See e.g., Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299 (1986).  What is clear at this juncture is that both the school system and Principal Couch are liable for these damages.

21

Another Judge of this Court has recently noted that a local school district, like SGCS, is not an arm of the State, but is instead a local entity so that it is not protected by the 11th Amendment. *Logan v. Gary Community Sch. Corp.*, 2008 WL 4411518, *3 (N.D. Ind. Sept. 25, 2008). As such, SGCS is liable here if the constitutional deprivations suffered by the plaintiffs occurred as the result of "a policy statement, ordinance, regulation or decision officially adopted and promulgated" by SGCS. *Monell v. Dep't of Soc. Serv. of City of New York,* 436 U.S. 658, 690 (1978). Plaintiffs must establish a "causal nexus" between their injury and SGCS' policy. *Palmquist v. Selvik*, 111 F.3d 1332, 1233 (7th Cir. 1997).

This is not a difficult hurdle in this case. The plaintiffs were disciplined because SGCS' policies allow students to be disciplined for off-campus activity, which has no impact on the school, but brings "discredit" on the school or the student. Each student handbook, which contains the policy, states that it contains a summary of the polices and rules for the operation of the high school. The plaintiffs were disciplined because of an unconstitutionally overbroad and vague policy of SGCS. SGCS is therefore liable.

Defendant Couch, in his individual capacity, is also liable for plaintiffs' injuries as he was "personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Centers, Inc.,* 305 F.3d 603, 614 (7th Cir. 2002). But, defendants have claimed in their Answer (Answer, Affirmative Defense ¶ 9) that Mr. Couch is entitled to qualified immunity.[15] This is erroneous.

An individual defendant is not entitled to qualified immunity if his conduct violates clearly established constitutional rights of which a reasonable person would have known at the time of the deprivation. *McAllister v. Price*, 615 F.3d 877 (7th Cir. 2010) (citing *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009)). The question is "whether the law was clear in relation to

---

[15]     The affirmative defense actually indicated that the "Smith Green Defendants are entitled to qualified immunity." (*Id.*). Of course, a government entity, like Smith-Green, or the principal sued in his official capacity, cannot partake of qualified immunity. *Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980).

the specific facts confronting the public official when he or she acted." *Kelley v. Myler*, 149 F.3d 641, 648 (7th Cir. 1998) (internal citation and quotation marks omitted).

As the numerous above citations demonstrate, by the time Principal Couch imposed sanctions on the girls in August of 2009, the law was clear that extra-curricular conduct could not be punished unless and until it caused a substantial disruption and that sanctions could not constitutionally be imposed for violating vague and overbroad notions of "discredit."  Thus, in *Coy,* the court held that based on *Tinker*, and numerous other cases, school officials were not entitled to qualified immunity for disciplining a student for his crude and juvenile out-of-school website that was not disruptive.  205 F.Supp.2d at 806.  Similarly, in *Seamons*, the court noted that the football coach who was sued after discharging a player who refused to apologize for assault reports he had filed against teammates was not entitled to qualified immunity given the expensive case law, beginning with *Tinker*, which circumscribes when students can be punished for expressive behavior.  206 F.3d at 1030.   The law here is clear and Principle Couch clearly violated it. He is not entitled to qualified immunity.

## IV.    The plaintiffs are entitled to a permanent injunction against the policy

The plaintiffs continue to participate in extra-curricular activities and are therefore subject to a policy that allows them to be punished for out-of-school actions that bring "discredit" on the school, regardless of any disruption. They therefore remain subject to a policy that is facially unconstitutional as violating the First Amendment, both because of its overbroad scope and its vagueness.  These problems have only been magnified by the statement in the current Student Handbook that purports to allow the school to discipline students for out of school internet usage pursuant to such vague and uncertain standards as "contrary to the rules and values" of SGCS and that include such things as "defamatory language", "material of a

sexual nature or sexual innuendo," or "other lewd or socially unacceptable behavior." 2010/2011 Student Handbook at 21-22.

Both plaintiffs have noted that they wish to continue with extra-curricular activities, but because of the unconstitutional policy adopted by SGSC and implemented by Principal Couch, they have restricted their use of social networking sites and as a result they do not express themselves as much as they did in the past. (T.V. Aff. ¶ 9, M.K. Aff. ¶ 9).   They are reluctant to engage in this expression because of their fear of being punished.  (*Id.*).

In order to obtain an injunction against the current policy and its future application, the plaintiffs must demonstrate that they are suffering, or threatened with, continuing irreparable harm. *Winter v. Natural Resources Defense Council, Inc.,* 129 S.Ct. 365, 380 (2008) (noting that the standard for permanent injunction is the same as a preliminary, except success on the merits must be demonstrated).   The existence of the challenged policy and the fact that it may, realistically, be applied to the plaintiffs' future conduct, or that it may deter constitutionally protected protection, is injury.  *See Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (referring to a criminal statute).   This has long been the rule in the school setting as well.   Thus, in *Sullivan v. Houston Indep. School Dist.*, 307 F.Supp. 1328 (S.D. Tex. 1969), the court found that permanent injunctive relief was proper to enjoin a school rule allowing the principal to act in the school's "best interests" that was used by a principal to punish students who had published an off-campus, non-disruptive newspaper.  *Id.* at 1345.   Permanent injunctive relief was justified given the rule's "overbreadth coupled with the threat of further improper enforcement in the future tends to 'chill' the exercise of first amendment freedoms."  *Id. a*t 1346 (internal citation omitted).

The plaintiffs are suffering an ongoing "chill" of their First Amendment rights.   A

violation of the First Amendment is irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976)

(plurality opinion). They are therefore entitled to a preliminary injunction enjoining application

of the unconstitutional policy.[16]

**Conclusion**

The plaintiffs are therefore entitled to partial summary judgment that their exclusion from

extra-curricular activities violated the First Amendment and that the policy utilized by SGCS is

unconstitutional and must be enjoined.  The matter must be set for trial as to plaintiffs' damages.

/s/ *Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059  ext. 104
fax:  317/635-4105
e-mail:  kfalk@aclu-in.org
Attorney for Plaintiffs

<u>Certificate of Service</u>

I hereby certify that this <u>15th</u> day of October, 2010, a copy of the foregoing was filed
electronically with the Clerk of this Court.  Notice of this filing will be sent to the following
parties by operation of the Court's electronic filing system and the parties may access this filing
through the Court's system.

Linda Polley/ James J. Shea, Sr./ Emily R. Yoder
HUNT SUEDHOFF KALAMAROS, LLP
Lpolley@hsk-law.com / jshea@hsk-law.com/ eyoder@hsk-law.com

W. Erik Weber
MEFFORD WEBER AND BLYTHE
Erik@lawmwb.com

/s/ *Kenneth J. Falk*
Kenneth J. Falk
Attorney at Law

---

[16]     The school has no interest in extending its disciplinary powers into areas protected by the First
Amendment.  And, the public interest is served by upholding the First Amendment. *Albright v. Board of Educ. of
Granite School Dist.*, 765 F.Supp.682,  686-87 (D. Utah. 1991).