UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| T.V., *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. 1:09-CV-00290 PPS-RBC |
| | ) | |
| SMITH-GREEN COMMUNITY SCHOOL | ) | |
| CORPORATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiffs claim that their First Amendment rights to free speech were violated when they were suspended from their extra-curricular and co-curricular activities for posting sexually suggestive photographs on the internet.  Plaintiffs' claims are deficient in several regards, rendering summary judgment proper.  Specifically, there was no First Amendment violation because the Plaintiffs do not have a constitutional right to participate in extra and co-curricular activities.  Moreover, Plaintiffs' conduct created the potential for substantial disruption of school activities.  Further, Plaintiffs' claims (with the exception of their request for injunctive relief) are barred by the Eleventh Amendment.  Finally, Plaintiffs' claims against Defendant, Austin Couch, in his individual capacity are prohibited by the qualified immunity doctrine.[1]

## II.  LOCAL RULE 56.1 STATEMENT OF FACTS

---

[1] The relevant facts are unique.  Specifically, this case involves out of school internet activity and discipline that *only* pertained to involvement in extra and co-curricular activities, *not* school attendance.  The Seventh Circuit has not addressed these issues, making this matter a case of first impression.  Further, Defense Counsel has not located any published decision that has addressed the unique issues presented in the case at bar.  While issues pertaining to students' First Amendment rights and student internet activity are no stranger to the court room, the specific issues raised in this litigation have not been addressed by any Court (as far as the Defendants are aware).

Plaintiffs, TV and MK, are students at Churubusco High School.  Defendant, Austin Couch ("Principal Couch"), is the Principal at the school and has been since August of the 2008-2009 school year.  (Deposition of Austin Couch ["Couch Dep."] at 6:21-24;7:1-5 [attached to Defendants Motion For Summary Judgment as Exhibit A]).

Defendant, Smith Green Community School Corporation ("SGCS") is located in Churubusco, Indiana and Churubusco High School is the public high school operated by SGCS.  (Defendants' Answer To Plaintiffs' "Amended Class Action Complaint for Declaratory and Injunctive Relief and Individual Action for Damages" at ¶ 8).

As for SGSC's funding, prior to substantial changes in funding for public schools (in 2008) the vast majority of SGCS's revenues were raised through local property taxes.  (Affidavit of Todd Fleetwood ["Fleetwood Aff."] at ¶ 3 [attached to Defendants' Motion For Summary Judgment as Exhibit E]).   In 2008, the General Assembly passed Public Law 146 which eliminated local property tax levies as a General Fund revenue source for schools.  (*Id*. at ¶ 4). The lost local revenues were replaced by direct state funds through an increase in the state sales tax.  (*Id*.).  The practical impact of Public Law 146 was to make schools such as SGCS almost entirely dependent on state funding.  (*Id*.).  Indeed, virtually all of SGCS's General Fund dollars are now provided by the state of Indiana.  (*Id*.).

SGCSC is required by state law to maintain five (5) separate funds.  These funds are the (a) General Fund; (b) Debt Service Fund; (c) Capital Projects Fund; (d) School Transportation Fund; and (e) School Bus Replacement Fund.  (*Id*. at ¶ 5).  The approved appropriation by the Department Of Local Government Finance for the 2010 SGCS General Fund in 2010 is $8,590,540.00.  (*Id*.).  Over 98% of SGCS's General Fund Revenues for 2010 come from the

State of Indiana. (*Id*). In turn, the General Fund provides approximately 75% of SGCSC's total operating revenue for 2010. (*Id*.).

Thus, the General Fund is the largest fund maintained by SGCS for its operation. (*Id*. at ¶ 6). By law, the General Fund is defined as a "general fund for the operation and maintenance of local schools." (*Id*.). Typical expenses paid out of the General fund include instructional salaries and benefits, supplies, and utilities. (*Id*.). Again, since the 2008 legislation, the revenue of the General Fund comes directly from the state. (*Id*.).

Despite SGCS's ability to use a referendum process to raise additional funds pursuant to Ind. Code § 20-40-3-3, this referendum process is tightly controlled by the State of Indiana and the outcome is wholly dependent on a majority vote by taxpayers. (*Id*. at ¶ 7). Many school referendums have been unsuccessful. (*Id*.). Due to the recently adopted state funding process the State of Indiana now exercises almost complete control over the operations of SGCS. Indeed, the state's Department of Local Government Finance ("DLGF"), reviews tax rates and levies of SGCSC and has final approval powers over its budget. (*Id*.).

In 2009, Plaintiffs were both members of Churubusco High School's volleyball team. (Deposition of TV ["TV Dep."] at 15:3-7 [attached to Defendants Motion For Summary Judgment as Exhibit B]; Deposition of MK ["MK Dep."] at 10:1-3 [attached to Defendants Motion For Summary Judgment as Exhibit C]). MK was also a member of the show choir and cheerleading squad. (MK Dep. at 9:23-24; 10:1-15).

Sometime during the summer of 2009, the Plaintiffs, along with a group of other female Churubusco High School Students, had a series of sleepovers at MK's house. (MK Dep. at 17:14; 18:1-4; TV Dep. at 35:20-24; 36:1-24; 37:1-3). At the time of the sleepovers, MK was 15 and TV was 16. (TV Dep. at 6:6-7; MK Dep. at 7:23-24).

During the sleepovers, the girls took a number of photographs of each other. (Amended Complaint at ¶ 19). In some of the photographs, the girls are scantily dressed. (TV Dep. at 63:6-8; 67:4-9). MK in particular is wearing lacy animal-print lingerie in some of the photos. (*Id.*). In several of the photographs, the girls are using penis-shaped lollypops as props. (TV Dep. at 58:7-10). The girls are depicted in some of the photos simulating sex acts with the penis-shaped lollypops. There is a photo of MK and TV simulating oral sex with the penis-shaped lollypops. (*Id.* at 56:23-24; 57:1-24; 58:1-2). There are also photographs of the girls simulating anal sex. (*Id.* at 64:8-14; 20-24; 65:1-4).

Indeed, the Plaintiffs acknowledge the sexual nature and the specific sex acts depicted in these photographs.[2] This is demonstrated by the following deposition testimony:

A.   I was pretending to suck on her cock, and she is sucking on her lollipop cock.
Q   And is it correct you have a lollypop positioned between her legs as if it's a penis on her?
A.   Yes
Q.   Would you agree that's a simulation of oral sex?
A.   Yes.

(TV Dep. at 57:18-24; 58:1-2; Exhibit N[3] to TV and MK's depositions).

Q.   Is that a sexual photo?
A.   Yes.
Q.   What does that depict?
A.   I don't know how to say this, but her getting it up the butt.
Q.   Anal sex?
A.   Yes.
Q.   So that's a depiction of anal sex?
A.   Yes.

---

[2] Plaintiffs (in their Rule 56 Motion) note that TV testified that photographs identified as Exhibits N, O, and P do not simulate sex. However, this deposition testimony is in contradiction of TV's prior, un-coached, testimony. Specifically, TV testified on direct examination that the photographs do depict certain sex acts. It was only on cross-examination, and after a break in the deposition (TV Dep. at 100:17-19), when TV was asked "Do you really think they simulate sex?" that she responded "No." (*Id.* at 107:9-10). Regardless of this contradictory testimony, the photographs speak for themselves.
[3] The photographs have been sealed pursuant to this Court's December 17, 2009 Order (Doc. No. 22). Defendants have designated photographs identified as deposition exhibits N, O, and P, in support of their Rule 56 Motion. All of the photographs are on file and available for review by the Court.

(*Id.* at 64:4-14; Exhibit O to TV and MK's depositions).

> Q.    Are you simulating a sex act in that photo?
> A.    Yes.
> Q.    And what sex act are you simulating in that photo?
> A.    Anal sex.

(*Id.* at 64:23-24; 65:1-4; Exhibit P to TV and MK's depositions).

Further, when specifically asked whether they were trying to convey a message with the photos, TV readily admitted they were not. (TV Dep. at 58:23-24; 59:1-2). Moreover, the young girls admit there is no artistic, literary, or scientific, value to the photographs. (MK Dep. at 43:18-24; 44:1; TV Dep. at 59:3-24). Indeed, the Plaintiffs maintain that these photographs were funny and merely a joke. (MK Dep. at 43:6-10; TV Dep. at 55:10-15).

Ultimately, TV and MK posted these photographs on the internet on their social networking pages, Facebook and MySpace. (TV Dep. at 69:17-23; *see also* MK Dep. at 24:16-22). They also posted some of the photographs on a website called Photobucket. (TV Dep. at 75:13-14; MK Dep at 24:23-24; 25:1-2). The girls maintain that profiles are "private" and only accessible by their internet "friends". (MK Dep. at 24:6-11; 24:23-24; 25:1-3).

Despite the privacy settings, it was acknowledged that their friends could copy the photographs from TV and MK's webpages "and do whatever they want with them". (TV Dep. at 88:8-15). Apparently, this happened because a concerned parent approached Principal Couch in August, concerning the photographs. (Couch Dep. 24:11-24). At approximately the same time, a parent brought a copy of the pictures to Steve Darnell, the Superintendent of SGCS. (Deposition of Steve Darnell at 9:24; 10:1 [attached to Defendants' Motion For Summary Judgment as Exhibit D). The parent advised Superintendent Darnell that the photographs were "causing issues with [her] daughter and the extracurricular teams." (*Id.* at 10:6-11). Superintendent Darnell then took the photographs to Principal Couch and advised him, "Austin,

5

this has been brought to the school.  It's causing a disruption in extracurricular teams.  We – you need to – you need to follow the code with this."  (*Id*. at 11:11-15).

Principal Couch reviewed the photographs and then notified TV and MK that they were being suspended from their extra and co-curricular activities for violating the student handbook. (Couch Dep. at 30:1-24; 31:1-24; 32:1-24; 33:1-24; 34:1-24; 35:1-24).  The suspension was in accordance with the school's Student Handbook, which provides:

> It shall be recognized that the Principal, by the administrative authority vested in him/her by the Smith-Green Community School Corporation, may exclude any student-athlete from representing Churubusco High School if his/her conduct in or out of school reflects discredit upon Churubusco High School or the IHSAA or creates a disruptive influence on the discipline, good order, moral, or educational environment at Churubusco High School.

(Amended Complaint at ¶ 17).  The basis for the suspension was the determination that the photographs were inappropriate, and that by posing for them, and posting them on the internet, the students were reflecting discredit upon the school.  (Couch Dep. at 48:1-11).  Furthermore, Principal Couch determined that this situation had the potential to cause disruption to school activities.  Specifically, Principal Couch testified:

> Q. I realize the code gives you other reasons to suspend.  Was there disruption afterwards caused by the pictures, or --
>
> A. Potential disruption.
>
> Q. And what -- tell me about that?
>
> A. The start of a school year, we're two weeks after we had lost two students in a car accident.  The incident is very similar to an incident that occurred last -- in the previous spring, in which it took time and effort in -- in just small school, small hallways, students talking.  This had the -- the potential of doing the exact same thing, being in the hallways, being in the gymnasiums, causing a disruption.  And in light of the recent events with our car accident, I felt, Superintendent had felt the urgency that this needed to be dealt with, and I dealt with it because this was the start of the school year, and I wanted to get off on the right foot, and I needed to do something before this blew up.

(Couch Dep. at 43:15-24; 44:1-16).[4]

Upon determining that the photographs violated the Student Handbook and in light of the potential disruption reasonably forecast by the circumstances, TV and MK were suspended from their extra and co-curricular activities for one year. (*Id.* at 52:21-41). They were given the option to decrease the suspension to 25% of the "season" if they participated in three counseling sessions. (*Id.* at 53:1-11). Both TV and MK exercised this option. (MK Dep. at 60:14-20; TV Dep. at 88:16-24; 89:1-3). Consequently, TV missed six volleyball games and MK missed five volleyball games and one show choir performance. (TV Dep. at 89:10-12; MK Dep. at 55:14-24; 56:1-2). They were not prohibited from practicing during the suspension period, nor were they expelled or suspended from school. (MK Dep. at 55:14-24; 56:1-11 and TV 80:10-21; 89:4-6).

Ultimately, this litigation ensued. Plaintiffs' claim,

> [t]he punishment of plaintiffs for expressive activity taken place outside of the Smith-Green Community Schools which activity did not disrupt in any way educational activity violated the First Amendment and to the extent that defendants have a policy allowing such punishment the policy is unconstitutional as violating the First Amendment as applied to such activity which is not disruptive.

(Amended Complaint at ¶ 45). Plaintiffs' claims fail, for the reasons set forth below. Summary judgment for the Defendants is warranted.

## III. LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FRCP 56(c). Rule 56 mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

---

[4] The prior situation referred to by Principal Couch involved photographs that were posted online, of students involved in extracurricular activities drinking or in the presence of alcohol. (Couch Dep. at 45:3-17).

and which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 521 (1986). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp*. 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *First Nat'l Bank of Cicero v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts that there is a genuine issue for trial. (*Id*.). "The days are gone, if they ever existed, when the non-moving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d, 1254, 1256 (7th Cir. 1990).

## IV. LAW AND ARGUMENT

### A. A showing of "substantial disruption" was not required because TV and MK do not have a constitutional right to participate in extra or co-curricular activities.

"It is well-established that students do not have a general constitutional right to participate in extracurricular athletics." *Lowery*, 497 F.3d at 588, *citing Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 180 F.3d 758, 763 (6th Cir. 1999), rev'd on other grounds, 531 U.S. 288, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001); *Alerding v. Ohio High Sch. Athletic Ass'n.*, 779 F.2d 315 (6th Cir. 1985); *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338 (3d Cir. 2004); *Niles v. Univ. Interscholastic League*, 715 F.2d 1027 (5th Cir. 1983). Further, the Supreme Court has stated,

> [i]nterscholastic athletics form a part of the extracurricular activities of the school and, as such, are promoted under the discretionary powers of the various boards or schools. ***They are not a part of the regular school curriculum and it is generally held that participation in such activities is a privilege which may be claimed by students only in accordance with the eligibility standards prescribed for participation***.

*Bruce v. South Carolina High Sch. League*, 258 S.C. 546 (1972) (emphasis supplied).

In *Lowery*, 497 F.3d at 586, high school football players signed a petition, which read, "I hate Coach Euvard [sic] and I don't want to play for him."  When the coach learned of the petition, he questioned each player, asking if he had signed the petition and if he still wanted to play football for him.  *Id*.  Players who signed the petition, but apologized to the coach and stated that they wanted to play for him were allowed to remain on the team.  *Id*.  Those who indicated that they did not want to play for the coach were no longer on the team.  *Id*.  The Sixth Circuit Court of Appeals held that the players' constitutional rights had not been violated.  Summary judgment in favor of the defendants was proper.  In reaching this decision, the Court noted:

> [o]f course, the school could not, and did not, suspend them for their opinions. Plaintiffs' ability to attend class has not been threatened.  As this Court has noted, "[t]he main purpose of high school is to learn science, the liberal arts and vocational studies, not to play football and basketball." . . . Plaintiffs' regular education has not been impeded, and, significantly, *they are free to continue their campaign to have Euverard fired*.  What they are *not* free to do is continue to play football for him while actively working to undermine his authority.

*Id*. at 599-600 (internal quotations omitted).  The Court in *Lowery* further noted:

> Confusing the right to express one's opinion with the right to participate in a voluntary government program on one's own terms would lead to an unworkable legal regime.  For example, suppose an applicant for a government job told the interviewer that he hated her and did not want to work for her, and was subsequently not hired for the position based on his attitude.  If the issue is framed as solely dealing with the applicant's right to express his opinion, he would be able to successfully bring a claim for viewpoint discrimination.  That would be an absurd result, and fortunately the First Amendment does not require it.  Likewise, if a group of students tried out for a football team and some students told the coach that they hated him and did not want to play for him, while others said that

they respected him and wanted to play for him, the coach could select the players with positive attitudes without violating the First Amendment.

As the Supreme Court has noted, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. Nor does it require high school football teams to be run in that fashion. ***When players voluntarily "go out" for a team they implicitly agree to accept the coach's authority***. When the government manages a voluntary program it may restrict conduct, including speech, that threatens the purpose of the program.

Of course, players do not completely waive their rights when they join a team: a coach could not dismiss a player simply because the player had religious or political views that were unpopular with his teammates. Nothing of the sort happened in the instant case. Nor was this a whistleblower situation, where players were disciplined for reporting improprieties. Plaintiffs participated in a petition stating "I hate Coach Euvard [sic], and I don't want to play for him," with the avowed intention of having Euverard fired. A consistent theme running throughout Tinker and its progeny is that the First Amendment rights of students are more limited than those of adults. ***Clearly, the Supreme Court would reject out of hand the argument that a government employee has a First Amendment right to attempt to have his or her employer fired. It would make little sense, legal or otherwise, to confer an analogous right upon high school student athletes.[5]***

*Id.* (internal citations omitted) (emphasis supplied).

This case is not about TV and MK's First Amendment right to post photographs on the internet. This case is about TV and MK's alleged right to belong to the volleyball team and show-choir on their own terms. No such right is protected by the First Amendment.

As members of the volleyball team and show choir, TV and MK were subject to the rules and regulations governing these extra and co-curricular activities. The Defendants determined that by posting sexually explicit and indecent photographs on the internet, TV and MK brought

---

[5] The *Lowery* Court notes that such an argument would be "rejected out of hand", with no reference to any actual or anticipated disruption. The Court makes no determination as to whether the disruption requirement applies to discipline respecting extra and co-curricular activity participation. Indeed, the parties in *Lowery* agreed that *Tinker* applied (i.e., the issue of applicability of the *Tinker* standard was not raised). 497 F.3d at 588. The Court did analyze the disruption caused by the players' conduct. *See, Id.* However, the Court's analysis, as set forth above, suggests that students who choose to participate in extra-curricular activities must adhere to the rules of conduct prescribed for that activity (regardless of any actual or forecasted disruption).

discredit upon the school (in violation of the school's code of conduct).  For this reason, TV and MK were suspended from their extra and co-curricular activities.

It is undisputed that TV and MK were not suspended from attending school.  They were not denied access to an education.  In fact, TV and MK (to the extent they believe the alleged "expression" is protected by the First Amendment [which Defendants' dispute]) were not denied their supposed First Amendment right to post sexually explicit photographs on the internet.  Rather, TV and MK had to make a decision.  If they wanted to participate in their respective extra-curricular activities, then they could not post sexually suggestive photographs online.

If, on the other hand, their desire to post such pictures was so great, they simply could have chosen not to participate in extra and co-curricular activities and continue posting photographs on the internet.  TV and MK's First Amendment right to freedom of expression has not been violated.  Any supposed damages suffered as a result of not being permitted to post certain photographs online was a result of TV and MK's own decision that participation in extra and co-curricular activities was more important than posting photographs online.  There is no constitutional violation (regardless of "substantial disruption").  Defendants are entitled to summary adjudication.

## B. Assuming the *Tinker* "substantial disruption" requirement applies, such requirement is satisfied.

In the seminal case of *Tinker v. Des Moines Independent Comm. Sch. Dist.*, 393 U.S. 503, 513 (1969), the Supreme Court recognized a student's right to express his opinions, even on controversial subjects.  However, the court noted that such expression is appropriate only if the student "does so without 'materially and substantially interfere[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others."  *Id*., *quoting Burnside v. Byaras*, 363 F.2d 744, 749 (1966).  The Court further noted,

"[b]ut conduct by the student, in class or out of it, which for any reason -- whether it stems from time, place, or type of behavior -- materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id*.

However, a school is not "required to prove that unless the speech at issue is forbidden serious consequences will *in fact* ensue." *Nuxoll v. Indian Prarie Sch. Dist.*, 523 F.3d 668, 673 (7th Cir. 2008). Rather, the school need only present facts that might reasonably lead school officials to forecast substantial disruption. *Id*.

Plaintiffs argue that Principal Couch conceded that the photographs had caused no disruption at the time TV and MK were punished and that his fear of potential disruption was limited to concern that students would discuss the photographs. This is an improper characterization of Principal Couch's deposition testimony. Principal Couch testified,

Q. I realize the code gives you other reasons to suspend. Was there disruption afterwards caused by the pictures, or --

A. Potential disruption.

Q. And what -- tell me about that?

A. The start of a school year, we're two weeks after we had lost two students in a car accident. The incident is very similar to an incident that occurred last -- in the previous spring, in which it took time and effort in -- in just small school, small hallways, students talking. This had the -- the potential of doing the exact same thing, being in the hallways, being in the gymnasiums, causing a disruption. And in light of the recent events with our car accident, I felt, Superintendent had felt the urgency that this needed to be dealt with, and I dealt with it because this was the start of the school year, and I wanted to get off on the right foot, and I needed to do something before this blew up.

(Couch Dep. at 43:15-24; 44:1-16).

Further, the parent who gave Superintendent Darnell a copy of the photographs advised that the pictures were causing issues with the extracurricular activities. When Superintendent

Darnell gave the pictures to Principal Couch, he advised Principal Couch that the photographs were causing disruption in the extra-curricular teams.

As set forth above, due to a prior, similar experience, Principal Couch was familiar with the potential disruption that can result when photographs posted online are brought into school.[6] *Tinker* and its progeny do not require a principal to sit back and wait for disruption to occur. Rather, school officials are permitted to be proactive and take the necessary steps to avoid disruption where such disruption is reasonably forecasted. Based on his prior experience, Principal Couch disciplined TV and MK in order to avoid the situation "blowing up".

Assuming that the "substantial disruption" requirement espoused in *Tinker* applies (which Defendants dispute), Plaintiffs' argument that their First Amendment rights were violated because there was no substantial disruption fails. As set forth above, Superintendent Darnell had been advised that the photographs were causing disruption. Further, Principal Couch reasonably believed that substantial disruption would result if the situation was not addressed. That being true, Defendants' Motion for Summary Judgment must be granted.

### C.  The Photographs Are Not Protected By The First Amendment.

"As a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Bolger v. Youngs Drug Products Corp*., 463 U.S. 60, 65 (1983). However, certain expressive materials fall outside the protection of the First Amendment. For example, obscenity and child pornography are afforded no First Amendment protection. *U.S. v. Stevens*, 130 S.Ct. 1577, 1583 (2010). Additionally, the First Amendment does not prevent schools from disciplining students' lewd, vulgar, or offensive language. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).

---

[6] The prior situation referred to by Principal Couch involved photographs, that were posted online, of students involved in extracurricular activities drinking or in the presence of alcohol. (Couch Dep. at 45:3-17).

### 1.   The Photographs Posted by Plaintiffs are "Obscene".

While obscenity has historically been outside the purview of the First Amendment protections, determining what was obscene has not always been easy.  Indeed, after discussing the somewhat tortured history of this Court's obscenity decisions, the United States Supreme Court in *Miller,* "finally set forth the governing three-part test for assessing whether material is obscene."  *New York v. Ferber*, 458 U.S. 747, 755 (1982).

Determining that an "expression" is obscene under the *Miller* analysis requires an assessment of:

> (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest;
>
> (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and
>
> (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller v. Cal.*, 413 U.S. 15, 24 (1973) (internal citations omitted).  In applying this test to the facts of the present case and the photographs taken by TV and MK it is clear that Plaintiffs' photographic "expressions" are obscene and not protected by the First Amendment.

### a)   The photographs appeal to the prurient interest.

Prurient is defined as, "marked by or arousing an immoderate or unwholesome interest or desire; *especially***:** marked by, arousing, or appealing to sexual desire".  *Merriam-Webster.com*. When determining whether a photograph appeals to the prurient interest, the court may consider how the picture would impress a member of a deviant sexual group such as a pedophile.  *See Pinkus v. United States*, 436 U.S. 293, 302 (1978) (finding that the question involved is not limited to how the picture impressed an individual juror, but rather, considering the intended and

probable recipients, how the picture would have impressed the average person, **or** a member of a deviant sexual group).[7]

The photographs taken and posted online by TV an MK clearly meet the first prong of the *Miller* test.  In the photographs, both Plaintiffs are scantily clad and are depicting oral and anal sex acts.  Arguably, the depicted sex acts might not rise to the level of obscenity, if the photographs were of adults.  That is, the average person, applying contemporary community standards', might not find that scantily clad adults engaging in such antics appeal to "prurient" interests.  However, any sexual desire aroused by viewing scantily clad adolescents depicting sex acts is "immoderate" and "unwholesome".  Thus, when one considers that young girls (and not adults) are performing the simulated sex acts, there is no doubt that the photographs appeal to prurient interests.  The first prong of *Miller* is satisfied.

### b)  The photographs depict "sexual conduct" in a patently offensive way.

The photographs also meet prong two of the *Miller* test as they clearly depict or describe, in a patently offensive way, "sexual conduct" as defined by Indiana state law.  Specifically, Indiana's "Child Exploitation" statute defines "sexual conduct" as:

> sexual intercourse, **deviate sexual conduct**, exhibition of the uncovered genitals intended to satisfy or arouse the sexual desires of any person, sadomasochistic abuse, sexual intercourse or deviate sexual conduct with an animal, or any fondling or touching of a child by another person or of another person by a child intended to arouse or satisfy the sexual desires of either the child or the other person.

I.C. § 34-42-4-4 (emphasis supplied).  "Deviate sexual conduct" (which is part of the "sexual conduct" definition) means an act involving

---

[7]  Lest plaintiffs maintain that "sexual deviants" were not their intended recipients, once they posted the photos on their social network sites they gave up control of how and to whom they were disseminated.  They had full knowledge that their "friends" could then disseminate them across the worldwide web.(MK Dep at 45:14-19;TV Dep.at 88:5-18).  Indeed these photographs made their way to Superintendent Darnell and Principal Couch (and there is no indication in the record that either gentleman is Facebook or MySpace "friends" with TV or MK).

**(1)** A sex organ of one person and the mouth or anus of another person; or

**(2)** The penetration of the sex organ or anus of a person by an object.

I.C. § 34-41-1-9.  Thus, oral and anal sex are "deviate sexual conduct" as defined by Indiana law.

Through deposition testimony, the Plaintiffs acknowledged that the photographs depict oral and anal sex.  Moreover, the pictures (and what is being depicted therein) speak for themselves.  Without a doubt, the photographs depict "sexual conduct" as defined by Indiana State law.  The second prong of *Miller* is satisfied.

> **c)**  **The photographs lack any serious literary, artistic, political, or scientific value.**

Lastly, the photographs meet the third prong of the *Miller* test, since the photographs are totally devoid of any serious literary, artistic, political, or scientific value.  The young Plaintiffs admit as much.  When specifically asked whether they were trying to convey a message with the photos, the girls readily admit they were not.  More importantly, the young girls specifically admit there is no artistic, literary, scientific, value to the photographs.

Having satisfied all three prongs of the *Miller* analysis for obscenity, it is clear that the photographs taken by MK and TV and posted on the internet are not protected by the First Amendment.  As such, any claimed violation of their First Amendment rights must fail.

**2.  The Photographs are Child Pornography.**

Regardless of whether the photographs satisfy the *Miller* test, they still are not protected by the First Amendment.  This is so because the photographs represent child pornography and violate both Federal and State "child exploitation" laws.  Thus, the photographs are not protected by the First Amendment.  *New York v. Ferber*, 458 U.S. 747, 763 (1982).

In *Ferber* the United States Supreme Court recognized that the welfare of children and the compelling interest in prosecuting those who promote the sexual exploitation of children

16

deserved a less compelling standard then that set forth in *Mille*r.  *Id*.  Thus, the Court determined that whether a work appeals to the prurient interest of the average person bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work.  *Id*.  The Court also determined that a sexually explicit depiction need not be "patently offensive" and that child pornography would be unprotected by the First Amendment even if it contained serious literary, artistic, political, or scientific value.  *Id.* at 761.

As was explained *supra* in the Defendants' argument on obscenity, Indiana's statutory definition of "sexual conduct" includes "deviate sexual conduct".  And as has also been established *supra*, depictions of oral and anal sex meet this definition.  Plaintiffs have admitted that their photographs depicted oral and anal sexual acts.  As such, they represent "deviate sexual conduct" under the statute and are pornographic, and prohibited by law.  Further, as mandated by *Ferber*, there is no requirement that the photographs appeal to the prurient interest, since children are involved.  Thus, these photographs are properly classified as child pornography and are not protected by The First Amendment.

Likewise, the photographs meet the definition of pornography under the Federal Statute, which defines child pornography as:

> any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—
>
> > (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

18 USCS § 2256(8).  "Sexually explicit conduct" is defined as "actual **or simulated** sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex. . . ."  18 USCS § 2256 (emphasis supplied).

It is important to note that this federal statute specifically includes sexually explicit conduct, which is either actual **or simulated**.  The fact that the Plaintiffs are not actually engaging in sex acts, but merely simulating them is of no consequence.  Indeed, the Plaintiffs have acknowledged that the photographs simulate oral and anal sex.  Likewise, the fact that the young girls are scantily clad, rather than nude does not matter.  See *United States v. Knox*, 32 F.3d 733, 749 (3rd Cir. 1994) (finding that 18 USCS § 2256 did not have a requirement of nudity and the court would not read such a requirement into a statute that has none).

Despite Plaintiffs' assertions that taking and posting of photographs was just an immature, humorous endeavor, the young girls violated both state and federal laws in doing so (and their ignorance of those laws is no excuse).  The photographs are pornography and possession and dissemination of the photographs violates the state and federal child exploitation statutes.  As such, these supposed "expressions" are afforded no First Amendment protection and Plaintiffs claims of First Amendment violations must fail.

**3. The Photographs are lewd, vulgar, and plainly offensive.**

Assuming *arguendo* that the photographs do not satisfy the *Miller* test and are not child pornography, they still are not protected by the First Amendment because the photographs are lewd, vulgar, and/or plainly offensive.

Prohibiting the use of vulgar and offensive terms is an appropriate function of a public school.  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986).  "Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions.  The inculcation of these values is truly the 'work of the schools.'"  *Id*, *quoting Tinker*, 393 U.S. at 508.  Moreover, education is not limited to books, curriculum, and civics class.  *Id*.  Rather, the Court opined:

> . . .schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers -- and indeed the older students -- demonstrate the appropriate form of civil discourse and political expression by their **conduct** and deportment **in and out of class**. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct. . .

*Id*. (emphasis supplied).   Further, there are limitations to the First Amendment protection provided to sexually explicit speech.  *Id*. at 685.

In *Fraser*, a high school student gave a vulgar and offensive speech, which was laden with sexual innuendo, while nominating a fellow student for class office.[8]   *Id*. at 677. Subsequently, he was suspended from school.  *Id*.  The Supreme Court held that the sanctions were proper in light of the offensively lewd and indecent speech.  *Id*. at 685.  The Court determined "it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education."  *Id*. at 685-86.  The Court further reasoned:

> [c]onsciously or otherwise, teachers -- and indeed the older students -- demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment **in and out of class**. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct. . .

The Supreme Court held in *Fraser* that the sexual content of a student's speech was vulgar, lewd, and offensive.  Plaintiffs have acknowledged that the subject photographs depict oral and anal sex.  Such conduct is wholly inconsistent with the fundamental values of a public education.  That being true, the photographs are not protected by the First Amendment.

---

[8] Defendants acknowledge that the facts in *Fraser* differ from the facts in the case *sub judice*.  Specifically, the *Fraser* speech was given to 600 students during a school-sponsored assembly.  *Fraser*, 478 U.S. at 677. Nonetheless, the case is instructive with respect to a school's regulation of lewd and vulgar speech.  Further, it is undisputed that the photographs did in fact make it into the school.

**D. The Defendants are entitled to immunity pursuant to the Eleventh Amendment.**

The *Eleventh Amendment* provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI.    In this regard, the Supreme Court "'has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" *Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417, 420 (7th Cir. Ind. 2008), *quoting Peirick v. IUPUI Athletics Dep't*, 510 F.3d 681, 694-95 (7th Cir. 2007). The Supreme Court has also held that state agencies, as arms of the state, are immune from suit under the Eleventh Amendment.  *Id.*  Accordingly, to the extent that Plaintiffs seek money damages from the Defendants, they are barred because Defendants are arms of the state for Eleventh Amendment immunity purposes.  *See Parker v. Ind. High Sch. Ath. Ass'n*, 2010 U.S. Dist. LEXIS 103432, 6-7 (S.D. Ind. Sept. 27, 2010) and *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir. 1987).

The analysis for determining whether an entity is an "arm of the state" is governed by a two-step inquiry.  The extent of the school corporation's financial autonomy from the state must be considered, as well as its general legal status.  *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir. 1987).  However, the most important factor is the extent of the entity's financial autonomy from the state.  *Id.* at 847.  To conduct this analysis the current funding structure of the school Corporation must be studied.

Had the present case been filed prior to 2008 the Eleventh Amendment might not offer immunity to the Defendants.  However, this has changed since Indiana's General Assembly passed Public Law 146, which eliminated local property tax levies as a General Fund revenue

source for schools.  Local revenues were replaced by direct state funds through an increase in the state sales tax.  The practical impact of Public Law 146 was to make public schools almost entirely dependent on state funding.  Indeed, 98% of SGCS's General Fund dollars are now provided by the state of Indiana.[9]

Since the change in state funding at least two judges in Indiana's Southern District Court have determined that school corporation defendants were arms of the state.  *See Long v. Turner*, 664 F. Supp. 2d 930 (S.D. Ind. 2009) and *Parker v. Ind. High Sch. Ath. Ass'n*, 2010 U.S. Dist. LEXIS 103432, 6-7 (S.D. Ind. Sept. 27, 2010). [10]  The rationale for this determination in both of these cases was that under the new funding laws, the State of Indiana exercises almost complete control over the operations of school corporations.  And while in both cases the district courts were not convinced that the "legal status" weighed in favor of autonomy, they found that the schools' financial dependence on the state of Indiana far outweighed the generally independent legal status of the school corporations.

The same is true of SGCS's financial dependence.  Indeed over 98% of SGCS's General Fund Revenues come from the State of Indiana.  Furthermore, state law also determines how the funds may be used.  Therefore, as will likely be the case of all public school corporations under Public Law 146, SGCS has virtually no autonomy in determining how funds may be used.  Furthermore, just as with all school corporations under the new law, the ability to raise funds is limited to the referendum process which requires a taxpayer vote.  Thus, there is never any guarantee that this will be a source for funding.  As such, SGCS is an arm of the state for

---

[9] For this reason Plaintiffs' assertion that *Logan v. Gary Community Sch. Corp.*, 2008 WL 4411518 *3 (N.D. Ind. Sept. 25 2008) suggests that school corporations do not have *Eleventh Amendment* immunity is of no consequence. *Logan* was decided before Public Law 146 was effective and relied in its analysis on precedent from cases decided several years before that time.

[10] As Judge Barker cautioned in *Long*, Defendants are cognizant that district court cases do not have precedential authority.  Nevertheless, as the court in *Parker* stated in explaining its use of the same analysis, and reaching the same result, "[Judge Barker's] analysis and conclusion were persuasive". Parker at *7.

Eleventh Amendment purposes.  Plaintiffs' claims for damages are barred and summary judgment is warranted in this regard.

### E.  The claims against Defendant Couch fail as a matter of law.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 815, *quoting Harlow* v. *Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (abrogated by *Pearson*, as explained below), the Supreme Court mandated a two-step process for determining whether a government official is entitled to qualified immunity.  According to the *Saucier* Court, the court must first consider whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation.  *Id*.  If there is no constitutional violation, the analysis need proceed no further.  *Id*.  If a constitutional violation is established, the court must analyze whether the constitutional right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Id*.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [school administrator] that his conduct was unlawful in the situation."  *Id*. at 201-02.  The plaintiff must offer "either a closely analogous case or evidence that the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts." *Casteel v. Pieschek*, 3 F.3d

1050, 1053 (7th Cir. 1993).  A constitutional right is clearly established if, the contours of the right are sufficiently clear such that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Supreme Court moved away from the rigid two-part test mandated by *Saucier*. Specifically, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 818.  However, Principal Couch is entitled to prevail under either prong of this analysis.

First, as shown in section IV.C. above, the conduct alleged did not rise to the level necessary to be a Constitutional violation.  Plaintiffs' suspension from their extra and co-curricular activities did not violate their First Amendment right to freedom of speech.

Secondly, even if Principal Couch violated Plaintiffs' constitutional rights, the contours of the right are not sufficiently clear that a reasonable administrator would understand that his actions violated this right.  And Plaintiffs cannot offer a single closely analogous case.  Indeed, the Seventh Circuit has not addressed this issue.  Moreover, Plaintiffs acknowledge that "[t]he Supreme Court, therefore, has not addressed the question of when expressive conduct taking place off of school grounds at non-school activities, can constitutionally lead to punishment in school."  (Plaintiffs Memorandum in Support of Motion for Partial Summary Judgment, page 15).  There are however, numerous published opinions that address issues related to discipline for a student's internet-related activities.  However, the outcomes in these cases are inconsistent (and none involve facts identical to those in the case at hand).  *See*, *Lowery v. Layshock v. Hermitage Sch. Dist.*, 593 F.3d 249, (3rd Cir. 2010) (10-day school suspension, placement in the

Alternative Education Program for the remainder of the school year, and not being permitted to participate in his graduation ceremony as punishment for creating a MySpace "parody profile" of the school principal was a violation of the students' First Amendment rights), *but see*, *Snyder v. Blue Mountain Sch. Dist.*, 593 F.3d 286 (3rd Cir. 2010) (10-day out of school suspension for creating a fictitious MySpace profile purporting to belong to the school principal was not a violation of the students' First Amendment rights), *see also*, *Doninger v. Niehoff*, 514 F.Supp. 199 (Conn. 2007) (student's First Amendment rights were not violated when she was prohibited from running for class secretary after posting a online blog stating her frustration with school officials).

To be certain, there is no clear standard of when a student's out of school, internet activity, is properly subject to discipline by a school administrator. Nor, is there any case that addresses such conduct and discipline that is limited to suspension from an extra or co-curricular suspension. Moreover, there is no evidence that Principal Couch's conduct was so patently violative of Plaintiffs' First Amendment rights that a reasonable administrator would know it without guidance from the courts. In fact, the Court's have come down on both sides of this issue when addressing students' online speech.

A reasonable administrator would not have reason to believe that a suspension from extracurricular activities violated a students First Amendment rights. Therefore, Principal Couch is entitled to qualified immunity and summary judgment.

## V. CONCLUSION

For all of these reasons, Defendants' Rule 56 Motion must be granted in all respects (and final judgment entered in favor of Defendants).

Respectfully submitted,

HUNT SUEDHOFF KALAMAROS LLP

  /s/ Linda A. Polley
Linda A. Polley        #10897-02
Emily Yoder            #27403-02
803 South Calhoun Street, Suite 900
P.O. Box 11489
Fort Wayne, Indiana  46858-1489
Telephone: (260) 423-1311
Facsimile: (260) 424-5396
ATTORNEYS FOR DEFENDANTS

### CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to any CM/ECF participants, and I hereby certify that I have mailed by United States Postal Service the document to any non-CM/ECF participants.

| | |
|---|---|
| Kenneth J. Falk | W. Erik Weber |
| ACLU OF INDIANA | MEFFORD WEBER AND BLYTHE |
| 1031 E. Washington Street | 130 East Seventh Street |
| Indianapolis, IN  46202 | Auburn, IN  46706-1839 |
| kfalk@aclu-in.org | Erik@lawmwb.com |

  /s/ Linda A. Polley
Linda A. Polley/James J. Shea, Sr.