**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| T.V., a minor child, by her parents, legal guardians and next friends, B.V. and T.V., and M.K., a minor child, by her parents, legal guardians and next friends, G.K. and R.K., | ) )) )) ) |
| Plaintiffs, | ) ) |
| v. | )  NO. 1:09-CV-290-PPS |
| | ) |
| SMITH-GREEN COMMUNITY SCHOOL CORPORATION and AUSTIN COUCH, Principal of Churubusco High School, | ) )) |
| Defendants. | ) ) |

**OPINION AND ORDER**

Not much good takes place at slumber parties for high school kids, and this case proves the point.  During a summer sleepover, plaintiffs – 16 year old T.V. and 15 year old M.K. – posed for some raunchy photos which they later posted online.  When school officials caught wind of the saucy online display, they suspended both girls from extracurricular activities for a portion of the upcoming school year. This lawsuit, brought by T.V. and M.K. through their parents, seeks to vindicate their First Amendment rights. The defendants are the Smith-Green Community School Corporation and Austin Couch, the principal of Churubusco High School. Both sides now seek summary judgment.  The case poses timely questions about the limits school officials can place on out of school speech by students in the information age where Twitter, Facebook, MySpace, texts, and the like rule the day.  The school argues that they ought

1

to be allowed to regulate this speech while the students claim that their First Amendment rights are being violated.

Let's be honest about it: the speech in this case doesn't exactly call to mind high-minded civic discourse about current events. And one could reasonably question the wisdom of making a federal case out of a 6-game suspension from a high school volleyball schedule.  But for better or worse, that's what this case is about and it is now ripe for disposition.

## FACTS

The parties agree that there are no facts in dispute that are material to a determination of liability.  DE 65, p.1; DE 92, p.2.  Here's what the record reveals: during the summer of 2009, T.V. and M.K. were both entering the 10th grade at Churubusco High School, a public high school of approximately 400 students.  Both T.V. and M.K. were members of the high school's volleyball team, an extracurricular activity, and  M.K. was also a member of the cheerleading squad, also an extracurricular activity, as well as the show choir, which is a cocurricular activity. Cocurricular activities provide for academic credit but also involve activities that take place outside the normal school day.

Try-outs for the volleyball team for the coming year would occur in July. A couple of weeks prior to the tryouts, T.V., M.K. and a number of their friends had sleepovers at M.K.'s house. Prior to the first sleepover, the girls bought phallic-shaped rainbow colored lollipops. During the first sleepover, the girls took a number of photographs of themselves sucking on the lollipops.  In one, three girls are pictured and M.K. added the caption "Wanna suck on my cock." In another photograph, a fully-clothed M.K. is sucking on one lollipop while another lollipop is positioned between her legs and a fully-clothed T.V. is pretending to suck on it.

2

During another sleepover, T.V. took a picture of M.K. and another girl pretending to kiss each other.  At a final slumber party, more pictures were taken with M.K. wearing lingerie and the other girls in pajamas.  One of these pictures shows M.K. standing talking on the phone while another girl holds one of her legs up in the air, with T.V. holding a toy trident as if protruding from her crotch and pointing between M.K.'s legs.  In another, T.V. is shown bent over with M.K. poking the trident between her buttocks.  A third picture shows T.V. positioned behind another kneeling girl as if engaging in anal sex. In another picture, M.K. poses with money stuck into her lingerie – stripper-style.

T.V. posted most of the pictures on her MySpace or Facebook accounts, where they were accessible to persons she had granted "Friend" status.  Some of the photos involving the lollipops were also posted on Photo Bucket, where a password is necessary for viewing.  None of the images identify the girls as students at Churubusco High School.  Neither T.V. nor M.K. ever brought the images to school either in digital or any other format.  In their depositions, both T.V. and M.K. characterized what they did as "just joking around" and disclaimed that the images conveyed any scientific, literary or artistic value or message, but testified that the photos were taken and were shared on the internet because the girls thought what they had done was funny and "wanted to share with [their] friends how funny it was."  DE 65-4, p. 24; DE 65-6, p.13.[1]

Around August 4, a parent brought printouts of the photographs to Steve Darnell, the Superintendent of Smith-Green Community School Corporation.  The parent reported that the images were posted on Facebook and Photo Bucket and that the photographs were causing

---

[1] Cites to the record are to the page number of the document as filed with the Court, rather than to the potentially different internal page number of the document, as in the case of deposition excerpts, where, *e.g.*, page 86 of T.V.'s deposition is found at page 24 of 35 of the court-filed document 65-4.

"divisiveness" among the girls on the volleyball teams, because "two camps" had formed – girls that were "in favor...of what was going on with the pictures" and "girls that just wanted to have no part in it."  DE 75-4, p.3.  Evidently, this woman's daughter did not play volleyball in the fall of 2009.  Superintendent Darnell immediately took the pictures to Principal Couch, reported that the photos were "causing a disruption in extracurricular teams," and told him to "follow code with this."  *Id*. at p. 4.[2]  Separately, but on the same day as Superintendent Darnell provided the photographs to Principal Couch, the principal was contacted by a second concerned parent, one who happened to work at the school as an athletic department secretary, about the photographs posted on the internet.

The Churubusco High School Student Handbook for 2008-2009 contains an "EXTRA-CURRICULAR/CO-CURRICULAR CODE OF CONDUCT AND ATHLETIC CODE OF CONDUCT."  DE 65-2, p. 40.  On page 25, this code provides:

> The purpose of the "Extra-Curricular Code of Conduct" is to demonstrate to students at Churubusco High School who participate in organized extra-curricular activities that they not only represent themselves, but also represent Churubusco High School, as well.  Therefore, those students who choose to participate in extra-curricular activities are expected to demonstrate good conduct at school and outside of school. ... This code will be in force for the entire year including out of season and during the summer.

*Id*.  Separately, under the heading  "EXTRA-CURRICULAR/CO-CURRICULAR ACTIVITIES" on page 24, the Student Handbook states: "If you act in a manner in school or out

---

[2] The record is not entirely clear which of the photos submitted as exhibits were brought to the principal & superintendent, and so were the basis for their actions and decisions.  By a process of elimination, I proceed on the understanding that all the photos submitted were considered by defendants, except for several that the briefing describes as having been taken at earlier times and not in the same slumber party context.  These are Exhibits I and S, and possibly L.

of school that brings discredit or dishonor upon yourself or your school, you may be removed from extra-curricular activities for all or part of the year." *Id.*

After confirming the identities of the girls in the images, and discussing the matter with the Athletic Director and the Assistant Principal, within a day of Principal Couch's receipt of the photographs, he informed M.K. and T.V. that they had violated the athletic code and faced suspension from extracurricular and cocurricular activities. At the time, T.V. and M.K. were both participating in volleyball practices and M.K. was attending rehearsals for the show choir. Principal Couch did not discuss the situation with any member of the volleyball coaching staff, other than approaching the volleyball coach to confirm that the girls were playing volleyball and to inform the coach that he needed to speak with the girls because of an extracurricular violation. Principal Couch did not speak with the director of the show choir until after M.K. was suspended, and then simply to advise the teacher of the suspension.

Defendants explain the basis for Principal Couch's decision as his "determination that the photographs were inappropriate, and that by posing for them, and posting them on the internet, the students were reflecting discredit upon the school." DE 75, p.3. In addition, Principal Couch determined that the photographs had the potential for causing disruption of school activities. Discussing the context of his decision-making with respect to M.K. and T.V., Principal Couch cites two other recent incidents. One was the death of two students in a car accident two weeks earlier. The other was an incident from the spring of 2009, in which photos on the internet of students drinking alcohol were the subject of what the principal characterized as disruptive talk at school in the hallways and gymnasiums. Against this background, Principal Couch wanted the new 2009-2010 school year "to get off on the right foot," and "needed to do something

5

before this blew up." DE 65-2, p.13. The conclusion that the photographs represented a violation of the Student Handbook coupled with the anticipation of potential school disruption from the situation served as the basis for the discipline imposed.

Principal Couch informed T.V. and M.K. that they were being suspended from extracurricular and cocurricular activities for a calendar year pursuant to the school's 2008-2009 policy, for bringing discredit on themselves and the school. The portion of the policy cited provided that "If you act in a manner in school or out of school that brings discredit or dishonor upon yourself or your school, you may be removed from extracurricular activities for all or part of the year." It was explained to the girls that, under the policy, they could obtain a reduction of their punishment by making three visits to a counselor and then meeting with the school's Athletic Board to apologize for their actions. When he was contacted by T.V.'s parents, Superintendent Darnell indicated that he supported Couch's decision.

Both T.V. and M.K. opted to visit the counselor, and completed those requirements by August 13, 2009. Subsequently, the girls each appeared separately before the Athletic Board, a panel consisting of Principal Couch, the Athletic Director, the Assistant Principal and the coaches. As a result, the punishment was modified and the girls were excluded from only 25% of their fall extracurricular activities, which meant that T.V. missed six volleyball games and M.K. missed five games and a show choir performance.

## ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If no reasonable jury could find for the nonmoving party, there is not a genuine issue of

material fact. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). On

summary judgment, facts and inferences are construed in favor of the non-moving party.

*Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010). However, in order to benefit from this

view of the facts, the non-moving party must provide evidence to support any essential element

that it has the burden of proving at trial, and conclusory allegations are not sufficient.

*Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Here, where there

are essentially no disputed facts, I must decide "whether either party 'is entitled to a judgment as

a matter of law.'" *Automobile Mechanics Local 701 v. Vanguard Car Rental USA, Inc.*, 502 F.3d

740, 748 (7th Cir. 2007).

### *Threshold questions*

In setting this matter for oral argument, I directed the parties to address certain threshold

questions. Order of May 12, 2011 [DE 95]. I wanted to know "whether and why the

photographs taken and posted to the internet by T.V. and M.K. constitute expression protected

by the First Amendment." *Id.* at 1. The presumption built into that inquiry led to a subsidiary

question, namely whether the basis of the girls' punishment was the conduct shown in the

photos, or the taking and posting of the images to the internet. Following the argument on May

27, the parties have filed supplemental memoranda on these questions.

Both at oral argument and in the subsequent memoranda, Smith-Green has stated that

T.V. and M.K. were punished for both the behavior shown in the images and for posting the

pictures to the internet. Here's what the defendants said in their brief: "The basis for the

suspension was the determination that the photographs were inappropriate, and that by posing for

them, and posting them on the internet, the students were reflecting discredit upon the school."

DE 72, p. 6, citing Couch Dep. [DE 71-1] at 48:1-11.  At argument, Smith-Green's counsel

asserted that the school could have imposed the same punishment based merely on the conduct,

if for example other students had seen and reported the conduct but no photos were taken.  Post-

argument, Smith-Green reiterated that "the activities depicted in the snapshots are conduct

distinct from publishing them to the internet and that these activities constitute a violation of the

extracurricular code."  DE 101, p.5.

Somewhat predictably, the parties are at odds as to whether the girls' conduct is protected

by the First Amendment.  T.V. and M.K. argue that the conduct depicted in the images was itself

protected by the First Amendment because it meets the intent-plus-perception test for expressive

conduct.  Indeed, the Supreme Court has held that pure conduct possesses sufficient

communicative elements to implicate the First Amendment if the "intent to convey a

particularized message was present" and if "the likelihood was great that the message would be

understood by those who viewed it."  *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting

*Spence v. Washington*, 418 U.S. 405, 410-11 (1974)).  It is for this reason that things like

burning a flag, wearing a black arm band, defacing a flag, and participating in a silent sit-in – all

expressive conduct – receive First Amendment protection. *See United States v. Eichman*, 496

U.S. 310 (1990) (burning flag); *Texas v. Johnson*, 491 U.S. 397 (1989) (same); *Tinker v. Des*

*Moines Independent Community School Dist.*, 393 U.S. 503 (1969) (wearing black arm bands);

*Spence v. State of Washington*, 418 U.S. 405 (1974) (defacing flag);  *Brown v. State of*

*Louisiana*, 383 U.S. 131 (1966) (participating in silent sit-in).

For its part, the school district does not directly address whether the conduct itself is

entitled to First Amendment protection, instead shifting its focus to the photographs, contending

8

that plaintiffs are merely attempting to "shroud their conduct in First Amendment protection" and that "[u]nder the Plaintiffs' argument, then *any* conduct which is the subject of photographic recording would be beyond the scope of school authorities to regulate." DE 101, p.2.   This characterization is inaccurate, as it fails to recognize plaintiffs' application of the *Texas v. Johnson* standard for determining whether conduct is protected.   So the school district has waived its argument on this point. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 705 (7th Cir. 2010); *Judge v. Quinn*, 512 F.3d 537, 557 (7th Cir. 2010).   In any event, T.V. and M.K. have the better of the argument.

The record supports the conclusion that, although juvenile and silly – and certainly not a high-minded effort to express an idea such as burning a flag or wearing a black arm band – the conduct depicted in the photographs was intended to be humorous to the participants and to those who would later view the images. In fact, the humor (such as it is) derives from the fact that the conduct, featuring toy props and "joke" lollipops, is juvenile and silly and provocative. No message of lofty social or political importance was conveyed, but none is required. *See Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 578 (1977) ("There is no doubt that entertainment, as well as news, enjoys First Amendment protection."); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) (live entertainment falls within the First Amendment guarantee).   As the Seventh Circuit observed in *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994):   "The First Amendment protects entertainment as well as treatises on politics and public administration.   Suppose Eberhardt had written not a novel set in a prosecutor's office but a love song, or a short story about a talking mouse, or a script for television sitcom.   Any of these works would be protected by the First Amendment."

Ridiculousness and inappropriateness are often the very foundation of humor.  The provocative context of these young girls horsing around with objects representing sex organs was intended to contribute to the humorous effect in the minds of the intended teenage audience. As I noted when setting the oral argument, the Supreme Court has said that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995).   The sexual tableau created by the plaintiffs was obviously staged with the intention to entertain themselves (and the later audience of their peers who viewed the pictures) with what they considered silly light-hearted humor.  That some particularized message was intended is demonstrated by the fact that the scenes were obviously staged and not entirely spontaneous.

The fact that adult school officials may not appreciate the approach to sexual themes the girls displayed actually supports the determination that the conduct was inherently expressive. *See IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University*, 993 F.2d 386, 392 (4th Cir. 1993) (finding the First Amendment protected a crude "low-grade" fraternity skit billed as an "ugly woman contest" because it was inherently expressive entertainment, as the University's objections themselves demonstrate).

On the record before me, I conclude as a matter of law that the conduct in which M.K. and T.V. engaged, and that they recorded in the images which led to their punishment by Smith-Green School Corporation, had a particularized message of crude humor likely to be understood by those they expected to view the conduct, and so was sufficiently expressive as to be considered within the ambit of the First Amendment.

The subsequent levels of analysis are whether the photographs themselves, and the posting of the images to the internet, were also protected by the girls' rights of free speech.  In light of the analysis as to the underlying conduct, these layers seem more straightforward.  The photographic recording of the staged event and the uploading of the images to the social networking sites are both efforts to memorialize and further communicate the expression engaged in by the conduct depicted in the images.  "The protection of the First Amendment is not limited to written or spoken words, but includes other mediums of expression, including music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures." *ETW Corp. v. Jireh Publishing, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) (citing *Hurley*, 515 U.S. at 569, *inter alia).*  "Art, even of the questionable sort represented by erotic photographs in 'provocative' magazines – even of the artless sort represented by 'topless' dancing – today enjoys extensive protection in the name of the First Amendment." *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1141 (7th Cir. 1985).

Nothing in *State v. Chepilko*, 965 A.2d 190 (N.J.Super.Ct.App.Div. 2009), the principal case relied upon by Smith-Green in support of it position, favors a different result. There a street vendor took photographs of people walking on Atlantic City's Boardwalk, and then attempted to sell them to the subjects.  When he was charged with a municipal violation for hawking on the Boardwalk without the required permit, he asserted that the First Amendment protected his photographic operation.  The commercial context clearly distinguishes the analysis from the context here.  The New Jersey Supreme Court found that the First Amendment issue turned on whether Chepilko's business activity and photographs were predominantly expressive.  *Id*. at 461.  Free speech principles were not implicated because it was evident that the photographer's

11

principal purpose was to make money.  *Id.* at 463.   By contrast, there was no commercial

purpose to the photographs in this case.

The law readily supports the conclusion that the images constitute protected expression,

for the same reasons that the underlying conduct has been found to be expressive for First

Amendment purposes, supplemented by the girls' intention to preserve the scenes they created

for further viewing.  *Beard v. Banks*, 548 U.S. 521, 543 (2006) (Stevens, J., dissenting); *Kaplan*

*v. California*, 413 U.S. 115, 119-20 (1973); *White v. City of Sparks*, 500 F.3d 953, 956 (9th Cir.

2007); *ETW Corp.*, 332 F.3d at 924 (6th Cir. 2003);  *Bery v. City of New York*, 97 F.3d 689, 696

(2nd Cir. 1996) ("paintings, photographs, prints and sculptures....always communicate some idea

or concept to those who view it, and as such are entitled to full First Amendment Protection.")

The next step, the publication of the images to the social networking sites, functioned in

effect as a public display of the photographs, and thereby itself expressed an intention to

communicate the expression inherent in the girls' conduct and the images of it.  *Burnham v.*

*Ianni*, 119 F.3d 668, 674 (8th Cir. 1997) ("First, however, we note that the expressive behavior at

issue here, i.e., the posting of the photographs within the history department display, qualifies as

constitutionally protected speech.")  As for the use of the internet, which has become the

billboard to the world, "[t]he Supreme Court has also made clear that First Amendment

protections for speech extend fully to communications made through the medium of the

internet." *Doe v. Shurtleff*, 628 F.3d 1217, 1222 (10th Cir. 2010), citing *Reno v. ACLU*, 521 U.S.

844, 870 (1997).  *See also James v. Meow Media, Inc.*, 300 F.3d 683, 696 (6th Cir. 2002).

For all these reasons, my backtracking to address these threshold questions yields a result

that ultimately makes the initial inattention to the issues unproblematic.  I trust, however, that as

a result of the detour, the analysis of the case is now more complete.  I conclude that whether the

punishment of T.V. and M.K. was based on the acts depicted in the photographs, the taking or

existence of the images themselves, or the posting of the photographs to the internet, each of

those possibilities qualifies as "speech" within the meaning of the First Amendment.

### *Is the speech involved nonetheless unprotected?*

The parties dispute whether the case involves speech protected by the First Amendment.

Defendants contend that, under distinct standards, the photographs constitute both obscenity and

child pornography, neither of which is protected by the First Amendment.  *United States v.*

*Stevens*, 130 S.Ct. 1577, 1584 (2010).   At the May 27th hearing, after being pressed on the point,

counsel for defendants conceded that the law on obscenity and child pornography are not

applicable here, and with good reason.

Obscene material is not protected by the First Amendment.  *Miller v. California*, 413

U.S. 15, 23 (1973). Smith-Green and Couch initially invoked the three-part test for obscenity set

out by the Supreme Court in *Miller*.  The second part of that test asks whether "the work depicts

or describes, in a patently offensive way, sexual conduct specifically defined by the applicable

state law." *Id.* at 24.  The state law defendants cite to is Indiana's definition of "sexual conduct"

in its statutes on child exploitation and possession of child pornography:

> "Sexual conduct" means sexual intercourse, deviate sexual conduct, exhibition of
> the uncovered genitals intended to satisfy or arouse the sexual desires of any
> person, sadomasochistic abuse, sexual or deviate sexual conduct with an animal,
> or any fondling or touching of a child by another person or of another person by a
> child intended to arouse or satisfy the sexual desires of either the child or the
> other person.

I.C. §35-42-4-4(a).  Tacitly acknowledging that the only item in this list that might apply to the

photographs here is "deviate sexual conduct," defendants then turn to the definition of that term

in I.C. §35-41-1-9: "'Deviate sexual conduct' means an act involving: (1) a sex organ of one person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object."

Although Smith-Green and Couch once blithely asserted that the photographs depict "deviate sexual conduct" within this definition, as necessary to meet the second element of the *Miller* obscenity test, I cannot reach the same conclusion. Not even a single photograph meets the definition of "deviate sexual conduct" because none of them depicts the sex organ, mouth or anus of two people, and none of the images depicts actual penetration. From the plain meaning of the words of the statutory definition, I conclude – consistent with the defendants' concession on the point – that the photographs do not depict "deviate sexual conduct" as defined in Indiana law, and that as a result the photographs do not constitute obscenity under the Supreme Court's criteria in *Miller*.

Neither do the photographs constitute child pornography under either state or federal statutes. Indiana's statutes addressing child pornography refer to images that include, depict or describe "sexual conduct by a child," using the same definition of "sexual conduct" as has been considered and rejected previously with respect to the obscenity analysis. I.C. §35-42-4-4(b) & (c). Defendants, while glossing over the inapplicable Indiana statutory definition of "sexual conduct" as discussed above, also initially argued that M.K. and T.V. have "admitted" that the photographs depicted oral and anal sexual acts. But this is a complete stretch of the girls' deposition testimony. The testimony referred to does not address the statutory definition of the term, and in any event could not do so, as these lay witnesses cannot offer such legal analysis and conclusions.

14

The federal definition, found at 18 U.S.C. §2256(8), requires a "visual depiction involv[ing] the use of a minor engaging in sexually explicit conduct."   The phrase "sexually explicit conduct" has a multi-part definition, from which defendants invoke this portion: "actual or simulated...sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex."  §2256(2)(A)(i).  With only candy phalluses and toy tridents, the photographs cannot be said to depict simulated oral-genital sexual intercourse or anal-genital sexual intercourse within the meaning of this statute.  Instead, the conduct depicted "must have created the realistic impression of an actual sex act to constitute simulated sexual intercourse."  *Tilton v. Playboy Entertainment Group, Inc.*, 554 F.3d 1371, 1376 (11th Cir. 2009).  An act "only constitutes simulated sexual intercourse...if it creates the realistic impression of an *actual* sexual act."  *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1080 (4th Cir. 2006) (emphasis in original).   Given this analysis, and defendants' later concession, the students' First Amendment claim is not defeated by a contention that their speech is  unprotected obscenity or child pornography.

### *What free speech standards apply?*

Having rejected Smith-Green and Couch's arguments that the photographs are not protected by the First Amendment, I must next determine what constitutional free speech standards apply.  Relying upon *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), Smith-Green and Couch first argue that the photographs are not entitled to First Amendment protection because they are lewd, vulgar and/or plainly offensive.  In *Fraser*, the Supreme Court held that the First Amendment does not prevent school officials from punishing "a vulgar and lewd speech...[that] would undermine the school's basic educational mission."  *Id*. at 685.  The

speech being made by the student in *Fraser* was at a school assembly.  M.K. and T.V.'s photographs were taken inside the privacy of their own homes and were published to the internet from outside of school.  Defendants contend that "it is undisputed that the photographs did in fact make it into the school."  While this may be true, it's beside the point.  Neither M.K. nor T.V. brought the material into the school environment.  Others did.

*Fraser* cannot be interpreted as broadly as Smith-Green and Couch want. Context matters, as *Fraser* itself notes:  "A high school assembly or classroom is no place for a sexually explicit monologue directed towards an unsuspecting audience of teenage students."  *Id.*  But as Justice Brennan noted in his concurrence, the Court's holding was limited: "If respondent had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate."  *Id.* at 688.

Indeed, the Supreme Court itself has noted *Fraser*'s limited scope: "A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' [citing *Fraser*, 478 U.S. at 685], even though the government could not censor similar speech outside the school."  *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988).  Still more recently in *Morse v. Frederick*, 551 U.S. 393, 405 (2007), the Supreme Court plainly stated that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected," echoing the observation of Justice Brennan in his *Fraser* concurrence.  So here Smith-Green and Couch cannot prevail on a characterization of the photographs as lewd and vulgar in reliance on *Fraser* because, simply put, "[t]he School District's argument fails at the outset because *Fraser* does not apply to off-campus speech."  *J.S. v. Blue Mountain School District*, __ F.3d __, 2011 WL 2305973, *11 (3rd Cir. June 13, 2011).

***The Tinker standard and its limits.***

All of which brings us to *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), where the Supreme Court considered a schools' punishment of students who wore black armbands to school to represent their objections to the Vietnam War and their support for a truce. The case presented a conflict between the rights of the students to free expression and the interest of the school officials in maintaining order in the educational environment. The Court balanced those competing interests by announcing the following standard: school officials can restrict student expression only if the officials can show "that the students' activities would materially and substantially disrupt the work and discipline of the school." *Id*. at 513. The Supreme Court found that there was "no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." *Id*. at 508. Therefore, the suspension of the students for their expression by wearing the armbands was found to violate their First Amendment rights. *Id*. at 514.

Smith-Green and Couch first argue that students have no constitutional right to participate in extracurricular activities, and therefore the discipline imposed upon M.K. and T.V. requires no showing of "substantial disruption." But *Tinker* itself defeats this argument:

> The principle of these cases [on student free speech] is not confined to the supervised and ordained discussion which takes place in the classroom...A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, **or on the playing field**, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others.

17

*Tinker*, 393 U.S. at 512-13 (emphasis added), quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966).   The constitutional right at issue is freedom of expression, not that of participation in extracurricular activities.  That there is no constitutional right to participate in athletics or other extracurricular activities may be pertinent to an analysis of other sorts of constitutional claims, such as a Due Process claim, a Privileges and Immunities claim, or an Equal Protection claim,[3] but as *Tinker* itself notes, not to a freedom of expression claim.

What this means is that a student cannot be punished with a ban from extracurricular activities for non-disruptive speech. For example, in a case involving suspension from a high school football team, the Ninth Circuit observed: "In holding that a student's First Amendment rights are 'not confined to the supervised and ordained discussion which takes place in the classroom,' the Court extended *Tinker*'s principles to school activities broadly defined, including extracurricular activities."  *Pinard v. Clatskanie School District 6J*, 467 F.3d 755, 769 (9th Cir. 2006).  Likewise, in *Doninger v. Niehoff*, 642 F.3d 334 (2nd Cir. 2011), the Second Circuit applied the *Tinker* analysis to the student's role as a student government representative and emphasized: "To be clear, we do not conclude in any way that school administrators are immune from First Amendment scrutiny when they react to student speech by limiting students' participation in extracurricular activities."  *Id.* at 351.

Defendants cite no case in which a court has held that discipline in the form of exclusion from extracurricular activities categorically could not implicate the First Amendment, or in

―――――――――――――――

[3] *See Angstadt v. Midd-West School District*, 377 F.3d 338 (3rd Cir. 2004), and *Niles v. University Interscholastic League*, 715 F.2d 1027 (5th Cir. 1983), for Due Process analysis; *Alerding v. Ohio High School Athletic Ass'n*, 779 F.2d 315 (6th Cir. 1985), for Privileges and Immunities analysis, and *Bruce v. South Carolina High School League*, 258 S.C. 546 (1972), for Equal Protection analysis.

which the *Tinker* standard was found not to apply because "only" extracurricular activities, not suspension or expulsion from school, were at issue.  Oddly, on this point, the defendants cite *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007), where the parties agreed that the case was "governed by *Tinker*," and the Sixth Circuit stated its standard: "school officials may regulate speech that materially and substantially interferes 'with the requirements of appropriate discipline in the operation of the school.'"  *Id.* at 588, *citing Tinker*, 393 U.S. at 513.  So rather than disavow the "substantial disruption" standard, the *Lowery* court applies it, finding in the context of the football team incident there, that the Plaintiffs' actions were "reasonably likely to cause substantial disruption on the Jefferson County football team."  *Lowery*, 497 F.3d at 594.  Discussion in *Lowery* concerning the special environment represented by athletic teams is properly seen as context for the determination of what constitutes "substantial disruption," which may be different with respect to the dynamics of a team than, say, in a classroom setting.

The Supreme Court has not considered whether *Tinker* applies to expressive conduct taking place off of school grounds and not during a school activity and has in fact noted that "[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents."  *Morse*, 551 U.S. at 401, *citing Porter v. Ascension Parish School Bd.*, 393 F.3d 608, 615, n.22 (5th Cir. 2004).  But nearly all federal courts have treated such circumstances as governed by the *Tinker* standard.  *See, e.g., Doninger v. Neihoff*, 527 F.3d 41, 48, 50 (2nd Cir. 2008); *Pinard*, 467 F.3d at 767 (9th Cir. 2006); *Boucher v. School Bd. of School District of Greenfield*, 134 F.3d 821, 827-28 (7th Cir. 1998); *Shanley v. Northeast Indep. School Dist., Bexar County, Texas*, 462 F.2d 960, 970 (5th Cir. 1972).

Recently, however, eight judges of the Third Circuit sitting *en banc* joined a majority opinion in which they **assumed without deciding** that *Tinker* applied to the student's off-campus creation of an abusive and profane parody profile of a middle school principal. *J.S.*, 2011 WL 2305973 at *7. The majority opinion noted that it didn't need to address the appellants' argument that the First Amendment restricts school officials' power to regulate student speech to "the schoolhouse itself" because the school district violated the student's free speech rights even if *Tinker* governed. *Id*. at *7, n.3. Five of the eight judges signed onto a concurrence which went further, endorsing the conclusion that *Tinker* does not apply to off-campus speech at all, "and that the First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large." *Id*. at *16.

In the present context, I will also assume without deciding that *Tinker* applies, because even under its contextual narrowing of the right of free speech, I conclude that the school officials violated the First Amendment rights of plaintiffs T.V. and M.K.

### *Substantial disruption*

Finally then, I arrive at the First Amendment standard to be applied, namely whether in the circumstances present here, Principal Couch reasonably found that the pictures posted on the internet had disrupted, or would materially and substantially disrupt, the work and discipline of the school. I agree with Principal Couch and Smith-Green that a showing of actual disruption is not required for the punishment to pass constitutional muster. School officials are not required to wait and allow a disruption of their school environment to occur before taking action. *Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. #204*, 523 F.3d 668, 673 (7th Cir. 2008) "It is not necessary that the school administration stay a reasonable exercise of restraint 'until disruption

actually occur[s].'" *Shanley*, 462 F.2d at 970 (quoting *Butts v. Dallas Independent School Dist.*, 436 F.3d 728, 731 (5th Cir. 1971)).  However, "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance."  *Saxe v. State College Area School District*, 240 F.3d 200, 211 (3rd Cir. 2001).

M.K. and T.V. are under the impression that the defendants concede the actual disruption argument, and that the disciplinary decision was made entirely on the basis of potential future disruption.  But this isn't the case.  The school defendants rely on the assertion that Principal Couch acted in part on the report of the complaining parent that the photographs *had already caused* divisiveness on school teams.  DE 72, pp. 5-6, pp. 12-13.  The mother who brought the photos to Darnell reported that they were "causing issues" with her daughter and the extracurricular teams. DE 71-4, p.3.[4]  The trouble was further described as "divisiveness" with the girls on the volleyball teams, that is, the girls' division into "two camps"– those "in favor, you know, of what – what was going on in the pictures" and those who "just wanted to have no part of it." *Id.*.  Superintendent Darnell's deposition testimony reflects that he shared the report of the  ongoing disruption – if one can call it that – with Principal Couch when he took him the pictures and directed him to handle the matter:

Q.  And then you went right over that day to Principal Couch, is that correct?

A.  Yes, finished my conversation with her [the complaining parent] and took and said, "Austin, this has been brought to the school.  It's causing a disruption in extracurricular teams.  We – you need to – you need to follow code with this."

---

[4] Curiously, it appears that this mother's daughter was not in fact on any of the school's volleyball teams at that time.  DE 65-3, p.2; DE 65-6, p.2. She may have just been a busybody.

DE 71-4, p. 4.   Yet Principal Couch's deposition testimony is at odds with his boss on that

point.  Indeed, Couch disavows any reliance on actual disruption as a basis for the actions he

took:

> Q.  Now, in determining that the girls should be suspended for violating
> the code, did you determine that there had been any sort of disruption caused in
> the school by the pictures?
>
> A.  Had not, at that time, been a disruption, that I was aware of.

DE 71-1, p.11.

Comparison of this testimony reflects a discrepancy in the record as to whether actual

disruption of school-sponsored student activity was in fact a basis for the imposition of the

discipline meted out to M.K. and T.V.  But even assuming it was, the actual disruption in this

case does not come close to meeting the *Tinker* standard.  Here's what *Tinker* says on that point:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not
> enough to overcome the right to freedom of expression.  Any departure from
> absolute regimentation may cause trouble.  Any variation from the majority's
> opinion may inspire fear.  Any word spoken, in class, in the lunchroom, or on the
> campus, that deviates from the views of another person may start an argument or
> cause a disturbance.  But our Constitution says we must take this risk....In order
> for the State in the person of school officials to justify prohibition of a particular
> expression of opinion, it must be able to show that its action was caused by
> something more than a mere desire to avoid the discomfort and unpleasantness
> that always accompanies an unpopular viewpoint.  Certainly where there is no
> finding and no showing that engaging in the forbidden conduct would 'materially
> and substantially interfere with the requirements of appropriate discipline in the
> operation of the school,' the prohibition cannot be sustained.

*Tinker*, 393 U.S. at 508-09, quoting *Burnside*, 363 F.2d at 749.

Defendants' showing of actual disruption is extremely weak.  Petty disagreements among

players on a team – or participants in clubs for that matter – is utterly routine.  This type of

unremarkable dissension does not establish disruption with the work or discipline of the team or

the school, much less disruption that is "substantial" or "material."  Consider, for example, *J.C. v. Beverly Hills Unified School District*, 711 F.Supp.2d 1094 (C.D.Cal. 2010), where school administrators dealt with the aftermath of a student's video clip posted to the website "YouTube," in which a group of students engaged in trash-talking about a fellow student.  On summary judgment, the district court held that getting a phone call from disgruntled parent, and evidence that a student temporarily refused to go to class and that five students missed some undetermined portion of their classes because of the episode, did not rise to the level of a substantial disruption.  *Id.* at 1117-19.

By way of contrast, consider the factual record presented on motions for summary judgment in the *Doninger* case, involving an off-campus blog post of a disgruntled would-be candidate for Senior Class Secretary about the scheduling of a Student Council event: "the controversy . . . had already resulted in a deluge of phone calls and emails, several disrupted schedules, and many upset students" and continued "as calls poured in for both [the] Principal...and Superintendent..., a group of upset students gathered outside [the Principal's] office, and Doninger and three other students were called out of class to meet with [school officials] in an effort to resolve the controversy."  642 F.3d at 349.

This case is much closer to *J.C.* than it is to *Doninger*.  Here, school officials cannot point to any *students* creating or experiencing actual disruption *during any school activity*.  Instead, the officials merely responded to the complaints of parents (two in all), and the complaints do not appear to have been confirmed with any students or coaches.  As was true of the armbands in *Tinker*, the photos in this case could be said, at best, to have "caused discussion outside of the classrooms, but no interference with work and no disorder."  *Tinker*, 393 U.S. at

514.  Certainly no evidence has been presented of the kind of serious issues enumerated recently by the Seventh Circuit as indicative of substantial disruption: "[s]uch facts might include a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school." *Zamecnik v. Indian Prairie School District*, 636 F.3d 874, 876 (7th Cir. 2011).

In sum, at most, this case involved two complaints from parents and some petty sniping among a group of 15 and 16 year olds.  This can't be what the Supreme Court had in mind when it enunciated the "substantial disruption" standard in *Tinker*.  To find otherwise would be to read the word "substantial" out of "substantial disruption."  *See e.g. J.C.*, 711 F.Supp.2d at 1119 (for *Tinker* "to have any reasonable limits, the word 'substantial' must equate to something more than the ordinary personality conflicts among middle school students that may leave one student feeling hurt or insecure"); *Scoville v. Bd. of Educ. of Joliet Township*, 425 F.2d 10, 14 (7th Cir. 1970) (protected speech that "undoubtedly offended and displeased the dean" but is not shown to have substantially disrupted or materially interfered with school activities cannot be punished).

As for the forecast of substantial disruption from the "publication" of the photographs on the internet, the school defendants assert rather summarily that the *Tinker* standard is met.  But they offer little, either in evidence or argument, as to the nature of the feared disruption.  The defendants merely assert that "due to a prior, similar experience, Principal Couch was familiar with the potential disruption that can result when photographs posted online are brought in to school," and that "[b]ased on his prior experience, Principal Couch disciplined T.V. and M.K. in order to avoid the situation 'blowing up.'" DE 72, p.13.  In his deposition, Couch testified to his analysis of the "potential disruption" as follows:

A.  The start of a school year, we're two weeks after we had lost two students in a car accident.  The incident is very similar to an incident that occurred last – in the previous spring, in which it took time and effort in – in just small school, small hallways, students talking.  This had the – the potential of doing the exact same thing, being in the hallways, being in the gymnasium, causing a disruption.  And in light of the recent events with our car accident, I felt, Superintendent had felt the urgency that this needed to be dealt with, and I dealt with it because this was the start of the school year, and I wanted to get off on the right foot, and I needed to do something before this blew up.

DE 71-1, pp. 43-44.

This thin record does not support a determination as a matter of law that the school officials made a reasonable forecast of substantial disruption.  To the contrary, if this is all the school corporation relies upon, I can conclude as a matter of law that the substantial disruption required by the *Tinker* test was not reasonably forecast.

To sum up: no reasonable jury could conclude that the photos of T.V. and M.K. posted on the internet caused a substantial disruption to school activities, or that there was a reasonably foreseeable chance of future substantial disruption.  And while the crass foolishness that is the subject of the protected speech in this case makes one long for important substantive expressions like the black armbands of *Tinker,* such a distinction between the worthwhile and the unworthy is exactly what the First Amendment does not permit.  With all respect to the important and valuable function of public school authorities, and the considerable deference to their judgment that is so often due, "[i]t would be an unseemly and dangerous precedent to allow the state, in the guise of school authorities, to reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities." *Layshock v. Hermitage School District*, __ F.3d __, 2011 WL 2305970, *9 (3rd Cir.  June 13, 2011).  Plaintiffs' motion for partial summary judgment will therefore be granted, and

defendants' summary judgment motion denied, on the issue whether T.V. and M.K. were punished in violation of their First Amendment rights.

### *Immunity from damages*

Smith-Green School Corporation invokes Eleventh Amendment immunity from damages. The sovereign immunity underlying the Eleventh Amendment protects state governments, and instrumentalities of state governments, from the imposition of damages under §1983 in federal courts.  *Atkins v. City of Chicago*, 631 F.3d 823, 838 (7th Cir. 2011).   Local public school districts have often been found not to enjoy Eleventh Amendment immunity, in part because of the local source of and control over their funding, based on their ability to levy taxes and to issue bonds.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle* 429 U.S. 274, 280 (1977).  The Supreme Court in *Mount Healthy* concluded that "a local school board such as petitioner is more like a county or city than it is like an arm of the State" and therefore "was not entitled to assert any Eleventh Amendment immunity from suit in the federal courts."  *Id.* at 280-81.  The impact of a money judgment on the state treasury is a critical consideration in such analyses, with the result that as to state universities, the opposite conclusion is usually reached.  *See*, *e.g.*, *Kashani v. Purdue University*, 813 F.2d 843, 845-46 (7th Cir. 1987).

Smith-Green cites 2008 changes by the Indiana legislature to the funding formula for Indiana's public schools, arguing that local property tax levies have been eliminated as a revenue source and replaced by sales tax revenue more directly controlled by the state, so that the school corporation is now an arm of the state entitled to immunity from damages under the Eleventh Amendment.  Two decisions by the United States District Court for the Southern District of Indiana are cited in support.

26

One of the Southern District decisions, in *Amber Parker v. Franklin County Community School Corporation*, Cause No. 10-3595, is now on appeal to the Seventh Circuit.  On May 31, 2011, the case was argued and taken under submission.  At the hearing in this court on May 27, counsel agreed with my reserving any ruling on the Eleventh Amendment issues, pending the Seventh Circuit's decision in *Parker.*  To the extent the present motions seek summary judgment on the issue, they are denied without prejudice to the matter being renewed by an appropriate motion after the Court of Appeals' ruling.

With respect to Principal Couch, qualified immunity is raised as a defense to any award of damages.  Qualified immunity shields public officials from civil liability for damages as long as their actions could reasonably have been thought to be consistent with the rights they are alleged to have violated.  *Leaf v. Shelnutt*, 400 F.3d 1070, 1080 (7th Cir. 2005).  The defense "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent and those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).  To defeat the defense, plaintiffs must cite analogous case law to show that the conduct alleged was unlawful, or that the violation was so obvious that a reasonable state actor would know that his action violates the constitution. *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir. 2001).

The Supreme Court has identified two key inquiries for assertions of qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  *Pearson* held that the court may decide these questions in

27

whatever order is best suited to the case at hand.  *Pearson*, 555 U.S. at 236.  The first question is one of law, while the second requires a broader inquiry.

On this issue, and in similar (although not identical) circumstances, many courts have found school administrators sued individually to have qualified immunity, generally on a finding that the constitutional rights at issue were not clearly established.  *See, e.g., Doninger*, 642 F.3d at 353 ["The law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors and judges."].   The recent discussion in *J.C. v. Beverly Hills Unified School District*, 711 F.Supp.2d 1094 (C.D.Cal. 2010), is most instructive.  There, as here, "although the Court has found that a violation of [plaintiff's] First Amendment rights has occurred, the second *Saucier* step unequivocally resolves the issue of qualified immunity in Defendants' favor."  *Id.* at 1124.

As the court noted, "[t]he Supreme Court has yet to address whether off-campus speech posted on the Internet, which subsequently makes it way to campus either by the speaker or by any other means, may be regulated by school officials."  *Id*. at 1125.  It remains true that, "while numerous recent cases have applied the Supreme Court's student speech precedents to cases involving student speech over the Internet...none have done so in a factually analogous setting." *Id* . at 1126.   Finally, in the Supreme Court's most recent student speech case, which did not even involve the complicating factor of the internet, the Court noted that "[t]here is some uncertainty at the outer boundaries as to when courts should apply school speech precedents." *Morse*, 551 U.S. at 401.

Consider the Third Circuit's recent fractured resolution of  *J.S.*, 2011 WL 2305973, in which the *en banc* court generated three different approaches to a school's punishment of a

student for her out-of-school creation of an insulting and vulgar MySpace profile as a parody of her middle school principal.  The majority opinion assumed without deciding that *Tinker* applied, and found as a matter of law that neither actual nor anticipated substantial disruption supported the school's discipline.  *Id*. at *9.  A five-judge concurrence took the more extreme position that the student was entitled to summary judgment because the First Amendment's protection of the student's off-campus speech is not properly limited even by the standards of *Tinker*.  *Id*. at *16.  Finally, a vigorous dissent by six judges, though applying *Tinker,* differed sharply on whether the abusive, profane profile of the principal reasonably supported a forecast of substantial disruption.  *Id*. at *24.

As Judge Wilson observed in *J.C.*: "While the five separate opinions in *Morse* aptly illustrate the 'plethora of approaches that may be taken in this murky area of the law'...the Justices were unanimous in at least one respect – all agreed that the principal was entitled to qualified immunity."  *J.C.*, 711 F.Supp.2d at 1126 (quoting *Morse*, 551 U.S. at 409).  So I find here as well, and conclude that Principal Couch has qualified immunity from damages because, on the current state of the developing law in this context, particularly involving student speech originating off-campus and by use of the internet, Couch's actions could reasonably have been thought to be consistent with the rights they are alleged to have violated.


### *Vagueness and Overbreadth*

T.V. and M.K. also argue that the school policy was unconstitutionally vague and overbroad because it permitted discipline based on the principal's conclusion that T.V. and M.K. had brought "discredit or dishonor" upon themselves and the school, a species of unbridled

discretion not permitted by the First Amendment. The challenge is to the portion of the Student Handbook that provides: "If you act in a manner in school or out of school that brings discredit or dishonor upon yourself or your school, you may be removed from extra-curricular activities for all or part of the year." DE 65-2, p.40.

T.V. and M.K. cite the Sixth Circuit's holding that "a statute or ordinance offends the First Amendment when it grants a public official 'unbridled discretion' such that the official's decision to limit speech is not constrained by objective criteria, but may rest on 'ambiguous and subjective reasons.'" *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998), *quoting Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996). T.V. and M.K. claim that "case law is clear that a standard allowing punishment for something that 'discredits' self or school is constitutionally impermissible." DE 66, p. 20.

In support of that statement, plaintiffs cite *Flaherty v. Keystone Oaks School District*, 247 F.Supp.2d 698, 706 (W.D.Pa. 2003). There the terms "offend," "abuse," "harassment" and "inappropriate" were "not defined in any significant manner" and so did "not provide the students with adequate warnings of the conduct that is prohibited." *Id.* at 704. In addition, the district court found "the Student Handbook policies at issue to be unconstitutionally overbroad and vague because they permit a school official to discipline a student for an abusive, offensive, harassing or inappropriate expression that occurs outside of school premises and not tied to a school related activity." *Id*.

Unconstitutional overbreadth may occur where a regulation that is directed at activities that are not constitutionally protected is structured so as to prohibit protected activities as well.

30

*City of Houston, Texas v. Hill*, 482 U.S. 451, 458 (1987). Overbreadth creates "a likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). For the overbreadth to render the policy unconstitutional, it must be "not only real but substantial in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). This aspect of the inquiry precludes invalidating a rule merely because it is susceptible to a few impermissible applications; instead, the breadth of the challenged language must be shown to reach a substantial amount of constitutionally protected conduct. *City of Houston*, 482 U.S. at 459 (statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application").

The Third Circuit has held that "[i]n undertaking this analysis in the public school setting, however, it is important to recognize that the school district may permissibly regulate a broader range of speech than could be regulated for the general public, giving school regulations a larger plainly legitimate sweep." *J.S.*, 2011 WL 2305973 at *14 (citing *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3rd Cir. 2002)). But as the earlier analysis indicates, with regard to student speech occurring out-of-school, the "plainly legitimate sweep" of school discipline reaches only speech that presents an actual, or reasonable expectation of, substantial disruption of the school's work and discipline.

Applying these principles to the provision at hand, it is obvious that out-of-school conduct that brings discredit or dishonor upon the student or the school is a standard that reaches a whole host of acts for which no First Amendment protection could be claimed. The broad

31

spectrum of criminal activity springs immediately to mind by way of example.  But the standard

may also reach a similar variety of speech or expressive conduct that would be protected by the

First Amendment.  Examples could include marching for or against certain political or social

causes, or publicly speaking out on topics school authorities deem taboo.  And much of such

speech or expressive conduct, as in this case, would not meet *Tinker*'s substantial disruption

standard so as to render it subject to school discipline.  Because the breadth of the standard

reaches a substantial amount of constitutionally protected conduct, I conclude as a matter of law

that the challenged language is impermissibly overbroad.

Before striking a statute as facially overbroad, however, I must consider whether the

language is susceptible to a reasonable limiting interpretation that would render it constitutional.

*Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1215 (9th Cir. 2010).  No reasonable limiting

construction of the challenged language has been proffered by Smith-Green, and none is

apparent.  Where the challenged limitation is not "open to one or a few interpretations, but to an

indefinite number...[i]t is fictional to believe that anything less than extensive adjudications,

under the impact of a variety of factual situations, would bring [it] within the bounds of

permissible constitutional certainty."  *Baggett v. Bullitt*, 377 U.S. 360, 378 (1964).  In such

circumstances "the chilling effect of the resolution on protected speech in the meantime would

make such a case-by-case adjudication intolerable."  *Board of Airport Commissioners v. Jews for

Jesus, Inc.*, 482 U.S. 569, 576 (1987).

As for the separate issue of vagueness, "[a] statute will be considered void for vagueness

if it does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if

it authorizes arbitrary enforcement."  *J.S.*, 2011 WL 2305973 at * 15, citing *Hill v. Colorado*,

530 U.S. 703, 732 (2000).  The first species of vagueness was found in *Baggett*, where the loyalty oath required of state employees was unconstitutionally vague because "[t]he range of activities which are or might be deemed inconsistent with the required promise is very wide indeed," and the oath failed to "provide[] an ascertainable standard of conduct."  *Baggett*, 377 U.S. at 371, 372.  Unconstitutional vagueness may also take the form of an "unrestricted delegation of power," where a statute leaves the definition of its terms to the enforcing officers and thereby invites arbitrary and overzealous enforcement.  *Leonardson v. City of East Lansing*, 896 F.2d 190, 198 (6th Cir. 1990).

The vagueness standard is also somewhat relaxed in the school setting: "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions."  *Fraser*, 478 U.S. at 686.  Nonetheless, vagueness will void a policy that "fails to give a student adequate warning that his conduct is unlawful or if it fails to set adequate standards of enforcement such that it represents an unrestricted delegation of power to school officials."  *Layshock v. Hermitage School District*, 496 F.Supp.2d 587, 606 (W.D.Pa. 2007).

Smith-Green cites dictionary definitions of "discredit" as "to deprive of good repute" and "dishonor" as "lack or loss of honor or reputation."  DE 75, p.12.  But the subjectivity of these definitions supports plaintiffs' position rather than defendants'.  The notion of good character inherent in each term introduces a nebulous degree of value judgment.  Issues of character and values involve such a broad spectrum of reasonable interpretation (but also strongly-held disagreement) as to be insufficiently conclusive for a disciplinary standard.   In other words, the

meaning of the terms may be readily understood by persons of ordinary intelligence, but ready agreement about all the conduct and circumstances they apply to cannot reasonably be expected. Such subjective terms have been found to render school disciplinary policies overbroad. *Killion v. Franklin Regional School District*, 136 F.Supp.2d 446, 459 (W.D.Pa. 2001) (punishment for "verbal/written *abuse* of a staff member").

On several occasions, the Seventh Circuit has found similar language in internal police department regulations to be unconstitutionally vague. In *O'Brien v. Town of Caledonia*, 748 F.2d 403 (7th Cir. 1984), the Court of Appeals considered charges that an officer engaged in conduct "causing serious discredit to the Department and the Town." *Id*. at 408. The Court found the language "functionally identical" to the phrase "Conduct...detrimental to the service," which it had earlier found unconstitutionally vague in *Bence v. Breier*, 501 F.2d 1185, 1190 (7th Cir. 1974). Such language has "no inherent, objective content from which ascertainable standards defining the proscribed conduct could be fashioned." *Id.* Because the concept of "serious discredit" can "only be subjectively applied," it fails the constitutional test. This analysis is instructive and applicable here, where the Student Handbook prohibition is based on similarly subjective notions of "discredit" and "dishonor."

Applying these strong doctrines with appropriate deference to the importance and necessity of schools' disciplinary authority, I nonetheless conclude that the Student Handbook provision on conduct "out of school that brings discredit or dishonor upon [the student] or [the] school" is impermissibly overbroad and vague under constitutional standards. This determination will support the issuance of an injunction against the enforcement of such a standard.

### *Motions to Strike*

Two motions to strike have been filed relating to the briefing of the summary judgment

motions.  Plaintiffs move to strike three statements in the affidavit of the school corporation's

business manager.  The challenged portions of Todd Fleetwood's affidavit read as follows:

> 4.  ...The practical impact of Public Law 146 was to make schools such as SGCSC
> almost entirely dependent on state funding....
>
> 7.  ...Despite SGCSC's ability to use a referendum process to raise additional
> funds pursuant to Ind. Code §20-40-3-3, this referendum process is tightly
> controlled by the State of Indiana and the outcome is wholly dependent on a
> majority vote by taxpayers....
>
> 8.  Due to the recently adopted state funding process the State of Indiana now
> exercises almost complete control over the operations of SGCSC....

DE 71-5, pp. 1-2.  Plaintiffs argue that these statements contain legal conclusions which are

inappropriate in an affidavit.  I think a more accurate characterization of the challenged

statements is that they reflect Fleetwood's opinions about the effect of the legislative changes

from the perspective of local school districts.  By presenting them in an affidavit, he merely

swears that these are his views.  Offered as opinion testimony by a lay witness, such views are

admissible under Fed.R.Evid. 701. In any event, the issue of Eleventh Amendment immunity is

currently tabled pending the Seventh Circuit's ruling in *Parker v. Franklin County Community

School Corporation*, Cause No. 10-3595, now under consideration on appeal.

Defendants' Motion to Strike is directed at plaintiffs' citation to an on-line newspaper

account for the facts of *Flaherty v. Keystone Oaks School District*, 247 F.Supp.2d 698 (W.D.Pa.

2003), a district court case plaintiffs cite.  The objection to the propriety of such a source could

just as well have been argued in an opposition brief rather than raised by a separate motion.

Further, I don't find the underlying facts in *Flaherty* to be significant to the necessary analysis.

35

In any event, the matters raised by the motions to strike do not prove critical to the resolution of the substantive motions now before me, and both motions will be denied.

## CONCLUSION

Today I determine as a matter of law that the punishment imposed on T.V. and M.K. for their out of school expression violated their First Amendment rights.  With the agreement of the parties, I reserve ruling on the issue of the school corporation's immunity from damages under the Eleventh Amendment, pending the Seventh Circuit's decision in *Amber Parker v. Franklin County Community School Corporation*, Cause No. 10-3595.  I conclude that Principal Couch is entitled to qualified immunity from damages because, though mistaken, his judgment could reasonably have been thought to be consistent with the students' rights, which were not clearly established at the time of his decision.  Finally, I conclude that a Student Handbook provision that authorizes discipline for out of school conduct that brings "dishonor" or "discredit" upon the school or the student is so vague and overbroad as to violate the Constitution.   I wish the case involved more important and worthwhile speech on the part of the students, but then of course a school's well-intentioned but unconstitutional punishment of that speech would be all the more regrettable.

**ACCORDINGLY:**

Plaintiffs' Motion to Strike [DE 88]  and defendants' Motion to Strike [DE 73] are DENIED.

Plaintiffs' Motion to Submit Supplemental Authority [DE 104] is GRANTED.

Plaintiffs' Motion for Partial Summary Judgment [DE 65] and Defendants' Motion for Summary Judgment [DE 71] are GRANTED IN PART and DENIED IN PART as follows:

Plaintiffs' claim of violation of their First Amendment rights by the punishment imposed on them by defendants Couch and Smith-Green is granted as a matter of law.

Plaintiffs' claim that the portion of the Churubusco High School Student Handbook authorizing student discipline for "out of school conduct that brings discredit or dishonor upon [the student] or [the] school" is unconstitutionally vague and overbroad is granted as a matter of law.

Defendant Smith-Green's invocation of Eleventh Amendment immunity from damages is denied without prejudice, but can be renewed by an appropriate motion following the Seventh Circuit's ruling in the case of *Amber Parker v. Franklin County Community School Corporation*, Cause No. 10-3595.

Defendant Couch's invocation of qualified immunity from damages is granted as a matter of law.

By separate order, the case will be set for a status conference.

**SO ORDERED.**

ENTERED:    August 10, 2011.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
